**2015-5011**

# United States Court of Appeals

*for the*

# Federal Circuit

---

DAVID D. GRIFFIN,

*Petitioner-Appellant,*

*v.*

SECRETARY OF HEALTH AND HUMAN SERVICES,

*Respondent-Appellee.*

---

*Appeal from the United States Court of Federal Claims
in 13-VV-280, Judge Eric G. Bruggink.*

---

## BRIEF FOR PETITIONER-APPELLANT

LISA A. ROQUEMORE
LAW OFFICE OF LISA A. ROQUEMORE
19200 Von Karman Avenue
Suite 500
Irvine, CA 92612
(949) 622-5572

*Counsel for Petitioner-Appellants*

DECEMBER 17, 2014

# CERTIFICATE OF INTEREST

Counsel for the Appellant, David D. Griffin certifies the following:

1.      The full name of every party or amicus represented by me is:  David D. Griffin.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  N/A.

3.      All parent corporations and any publically held companies that own 10% or more of the stock of the party or amicus curiae represented by me are:  N/A

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:  Lisa A Roquemore, Esq., Law Office of Lisa A. Roquemore.

December 17, 2014

Lisa A. Roquemore
Counsel of Record for the Petitioner
Law Office of Lisa A. Roquemore
19200 Von Karman Ave. Suite 500
Irvine, Ca. 92612
(949) 622-5572

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES ...................................................................iv

I.    STATEMENT OF RELATED CASES .........................................1

II.   STATEMENT OF JURISDICTION ............................................1

III.  STATEMENT OF THE ISSUES .................................................1

IV.   STATEMENT OF CASE ..............................................................2

     A.    Procedural Background ....................................................2

     B.    The Evidence Presented ...................................................5

V.    SUMMARY OF ARGUMENT ...................................................12

VI.   ARGUMENT................................................................................14

     A.    Standard Of Review .......................................................14

     B.    Applicable Law ...............................................................15

          i.    Standards Governing Summary Judgment ...............15

          ii.   Statutory Interpretation For 42 USC 300aa-11(c)(1)(B)(i) ......17

VII.  APPLYING TITLE V'S DEFINITION OF EMPLOYEE TO TITLE 42, THE VACCINE ACT WAS LEGAL ERROR .......................................23

VIII. PROPER INTERPRETATION OF TITLE 42'S EMPLOYEE OF THE UNITED STATES ..............................................................30

IX.   LEGAL ERROR WAS COMMITTED IN THE APPLICATION OF
      MOTION FOR SUMMARY JUDGMENT LAW. WHEN COMMON
      LAW AGENCY IS APPLIED CORRECTLY TO THIS CASE,
      EVIDENCE SHOWS THE ARMY EXERTED SUBSTANTIAL
      CONTROL OVER MR. GRIFFIN.................................................36

      A.    SM Millman Routinely Failed to Regard as True Mr. Griffin's
            Evidence on the Federal Government's Control Over the
            Manner and Means of His Employment ..............................37

      B.    Source of Instrumentalities and Tools, Location of the Work,
            Evidence of Control by the Army ......................................45

      C.    Role in Hiring, Paying, and Pre-Deployment Evidence of
            Control by the Army ........................................................45

      D.    Whether Work is Part of Regular Business of Hiring Party ..............49

      E.    Method of Payment, Employee Benefits, Tax Treatment..................50

      F.    Duration of Relationship Between the Parties, Right to Assign
            Additional Projects, Discretion Over When and How Long to
            Work .................................................................................51

      G.    Conclusion in Regard to Agency Test ...............................52

X.    WAS MR. GRIFFIN A MEMBER OF THE ARMED FORCES
      PURSUANT TO LEGISLATIVE INTENT ..................................53

XI.   CONCLUSION AND RELIEF SOUGHT ....................................58

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

Althen v. Sec'y of HHS
  418 F. 3d 280, 1274 (Fed. Cir. 2005) ...................................................................14

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242, 106 S. CT. 2505 (1986) ..................................................................15

Andreu v. Sec'y of HHS,
  569 F.3d 1367 (Fed. Cir. 2009)............................................................................14

Andrews v. Sec'y of HHS,
  1996 WL 300644 (1996)....................................................................20, 21, 29, 33, 57

Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.,
  682 F. 3d 1003 (Fed. Cir. 2012).............................................................................16

Billings v. United States,
  322 F.3d 1328 (Fed. Cir. 2003)................................................................... 27-28, 31

Bruesewitz v. Wyeth LLC.,
  __ U.S. __, 131 S. Ct. 1068, 179 L.Ed2d 1 (2011)........................................19, 32
Cloer v. Sec'y HHS (Cloer I),
  654 F.3d 1322 (Fed. Cir. 2011) (*en banc*) ......................................................19, 32

Cloer v. Sec'y HHS (Cloer II),
  675 F.3d 1358 (Fed. Cir. 2012) (*en banc*) ............................................................20

Cmty. for Creative Non-Violence v. Reid,
  490 U.S. 730 (1989)..............................................................................................23

Doe v. United States,
  513 F.3d 1348 (Fed. Cir. 2008)......................................................................27, 31

Figueroa v. Sec'y HHS,
   715 F.3d 1314 (Fed. Cir. 2013)................................................................19, 20, 32

Glaxo Operations UK Ltd. v. Quigg,
   894 F.2d. 392 (Fed. Cir. 1990)..............................................................18

Harris v. Atty. Gen.,
   657 F. Supp.2d 1 (D.D.C. 2009).......................................................22, 23, 51, 52

Hellebrand v. Sec'y of HHS,
   999 F.2d 1565 (Fed. Cir. 1993)..............................................................18

King v. Dalton,
   895 F. Supp. 831 (E.D. Va. 1995) ...............................................................22, 53

McGowan v. Sec'y of HHS,
   31 Fed. Cl. 734 (1994) .......................................................19, 32, 57, 58

Miller v. Fenton,
   474 U.S. 104 (1985)...........................................................................16

Munn v. Sec'y of HHS,
   970 F.2d 863 (Fed. Cir. 1992)..............................................................14

Nationwide Mut. Ins. Co. v. Darden,
   503 U.S. 318 (1992) .................................... 22, 23, 30, 35, 37, 45, 49, 51

Rooks v. Sec'y of HHS,
   35 Fed Cl. 1 (1996) ......................................................................14, 18

Spirides v. Reinhardt
   613 F.2d 826 (D.C. Cir. 1979) ..............................................................4

Staples v. Sec'y of HHS,
   30 Fed. Cl. 348 (1994) .......................................................................18

Suntiger, Inc v. Scientific Research Funding Group,
   189 F.3d 1327 (Fed. Cir. 1999.)..................................................................15, 35

United States v. American Trucking Ass'ns,
  310 U.S. 534, 60 S. Ct. 1059 (1940)...................................................1, 4, 17, 30, 53

U.S. v. X-Citement Video,
  513 U.S. 64 (1994)........................................................................................30

Winstar Corporation v. The United States,
  64 F.3d 1531 (Fed. Cir. 1995)......................................................................15, 36

## STATUTES

National Childhood Vaccine Injury Act,
  42 U.S.C. section 300aa-11(c), et seq............................................................passim

5 USC §2105(a) (2012)...................................................................................passim

## RULES

Federal Rules of Civil Procedure 56(c) ...................................................................15

Federal Rules of Civil Procedure 56(f)....................................................................15

## I.    STATEMENT OF RELATED CASES

No appeal of this case has been before any other court.  To the knowledge of the appellant, no related cases are pending in this or in any other court.

## II.    STATEMENT OF JURISDICTION

Petitioner-Appellee ("Petitioner" or "Griffin") brought his Petition for Compensation under the National Vaccine Injury Compensation Act before the United States Court of Federal Claims ("CFC") pursuant to 42 USC §300aa-11 and §300aa-12(a).[1]  The CFC issued a final decision on August 26, 2014 **(A001-A010)** and issued its final judgment on August 29, 2014.  **A437**.  This Court has jurisdiction to review the judgment under §300aa-12(f).  A Notice of Appeal was filed with this Court on October 14, 2014.

## III.    STATEMENT OF THE ISSUES

Whether the CFC erred by:

1.  applying Title 5's definition of "employee" to Title 42, the Vaccine Act, §300aa-11(c)(1)(B)(i);

2.  failing to apply the United States Supreme Court  rules of statutory construction as addressed by *American Trucking Ass'ns.* when a word within a statute is not defined;

---

[1] The Vaccine Act is located at 42 U.S.C. §§ 300aa–1 *et. seq.*  Individual sections to the Act will include only the section number.

1

3.  failing to analyze and address whether the appropriate legal standard was applied to a summary judgment decision, which requires a judge to, in this case, view the evidence presented on the motion in the light most favorable to the Petitioner; and all justifiable inferences are to be drawn in his favor.

## IV.    STATEMENT OF CASE

### A.  Procedural Background

Griffin filed his Petition for Compensation, pursuant to §300aa-11 and §300aa-12(a), on or about April 23, 2013 alleging that his influenza vaccine, required by the Department of Defense ("DOD"), resulted in his Guillain-Barré. This matter was assigned to Special Master Millman ("SM Millman").  In response to the Petition, Respondent filed a Motion for Summary Judgment alleging that Griffin was not an eligible petitioner, arguing a very narrow interpretation of the Vaccine Act's statutory language.  Griffin filed his Response and a Supplemental Response in opposition to the Motion for Summary Judgment outlining United States Supreme Court rules of statutory construction as well as case law regarding how the United States Army ("Army") was a "joint employer" of Griffin. Substantial and uncontroverted evidence was provided by Petitioner showing that the Army had considerable control over him, including the requirement of vaccination and being fit for duty as well as his "in theater" work activities as Site Manager at Forward Operating Base Rushmore in Afghanistan.  Based upon the

(1) evidence presented, (2) legislative intent, (3) rules of statutory construction, and (4) common law agency principles recognizing that an employee can have joint employers, Griffin submitted he was an "Employee of the United States" or a "member of the Armed Forces."  Also, it was undisputed that Griffin is a citizen of the United States.  Griffin argued that interpreting the Vaccine Act as narrowly as Respondent proposed would systematically exclude a class of United States citizens from being eligible to participate in the Vaccine Program, despite the fact that they are employees of United States companies, who support our United States Armed Forces, and are subject to the Department of Defense requirements, including the obtaining of certain vaccines.

Ultimately, SM Millman rendered a Decision granting Respondent's Summary Judgment Motion based, in part, upon her independent Internet research and based upon a very narrow interpretation of the Vaccine Act.  Further, the Decision, Petitioner submits, was made without viewing the evidence presented by Petitioner in a light most favorable to him and without all justifiable inferences drawn in his favor.

Griffin timely filed his Motion for Review on May 1, 2014.  He argued that: (1)SM Millman committed legal error in her statutory interpretation of the Vaccine Act's "Employee of the United States" and/or "Members of the Armed Forces." At minimum, she was arbitrary and capricious in her interpretation; (2)SM

3

Millman committed legal error in how she applied motion for summary judgment law; and, (3)SM Millman committed legal error, or at minimum abused her discretion, by conducting independent Internet research in violation of due process.

The case was assigned to Judge Bruggink of the CFC.  Judge Bruggink denied Griffin's Motion for Review.  **A001-A010**.  Judgment was entered August 29, 2014.  **A437.**

In his decision, Judge Bruggink agreed with Respondent that Title 5 of the United States Code, defining federal employee, applied to this case, citing to 5 U.S.C. §2105(a) (2012).  **A007.**  He further stated that even if you examine the Special Master's application of the common-law agency test and the factors applied by the *Spirides* court, we would conclude that it was not arbitrary and capricious.  **A008**.  To the extent the special master made any legal error, it was in petitioner's favor, and is thus harmless.  **A009**.  Judge Bruggink failed to provide any explanation as to why Title 5 applied to Title 42 of the United States Code, the Vaccine Act.  Judge Bruggink failed to follow the clear guidance and holding of the United States Supreme Court case, *American Trucking*, which states that the function of a court in statutory interpretation cases, when something is not defined, is "to construe the language so as to give effect to the intent of Congress." *United States v. American Trucking Ass'ns*, 310 U.S. 534, 542, 60 S. Ct. 1059, 1063 (1940).  (Emphasis added).  Judge Bruggink failed to address the legislative intent

in regard to the Vaccine Program; and, Judge Bruggink failed to address whether the Special Master had appropriately applied summary judgment law, which provides, among other things, that a court must view the evidence presented on the motion in the light most favorable to the opposing party.  The Notice of Appeal was filed October 14, 2014.  **A438**.

### B.  The Evidence Presented

Griffin was born on June 25, 1978.  **A078**.  He was born in California, USA and was and <u>still</u> is a citizen of the United States of America.  **A078**.  His family lives in Texas and California.  He was born and raised in the United States.  He has no intention of giving up his United States Citizenship.  He is in constant, if not daily, contact with his family via phone or Skype.  Griffin pays Federal Income tax to the Internal Revenue Service as well as his contributions to Social Security.  **A074-075**, **A091-A093**.  He remains in the Philippines because that is where he was airlifted originally; and, currently, the United States is too expensive for his health care and assistance needs.

Griffin, at all relevant times, thought he was a civilian government employee, who worked for Fluor Government Group ("Fluor") where his location of operation was Asia/Afghanistan.  **A081-A082**.  His job title was site manager.  **A083-A084**.

Fluor has a sizeable presence in the United States and is one of the largest

DOD contractors and likely the largest contractor in Afghanistan working side by

side by with our United States Armed Forces.  Fluor, under the United States Army

Logistics Civil Augmentation Program (LOGCAP IV), provides DOD, among

others, with multi-functional logistical services during contingency operations

worldwide to support United States national strategic objectives.  **A094-097**.  The

Army relies on commercial contractors, such as Fluor, to provide non-combat

support services to deployed United States DOD forces and other government

agencies.  **A244-A256**.  Outsourcing of these services enables the military to focus

on its mission.  Under Task Order 2 of the LOGCAP IV contract, Fluor provides

multi-functional base life support and combat service support to the United States

and coalition forces in Afghanistan.  The Fluor team is co-located with the United

States Army in Afghanistan, where the team coordinates, provides oversight, and

implements execution plans to provide the necessary resources and labor to

accomplish this mission.  The company responds to task order proposals and stands

ready to support the military in locations around the world.  **A094-A097**, **A098-**

**A177**[2].

Before deployment, Griffin was required by the DOD to get physical

examinations assessing his health and required to be found "fit for duty."  **A181-**

_____

[2] This is a redacted copy of LOGCAPIV award.

**A182; A200; A211; A222-A223**.  Many of the forms filled out for his pre-deployment health assessments were on <u>DOD forms</u>.  **A083-084**.  In addition to this requirement, the <u>DOD also had several Pre-Deployment requirements</u> including required security, background checks and any special clearances.  **A200-A201**.  In Griffin's case, the DOD required that he have a "<u>Confidential Clearance</u>."  **A268**, **A255**.  In addition to the LOGCAP IV requirements, including all of their modifications, Griffin was <u>subject to the authority of commanders</u> pursuant to the Secretary of Defense's "Memorandum for Secretaries of the Military Departments Chairman of the Joint Chiefs of Staff Under Secretaries of Defense Commanders Of the Combatant Commands" dated March 10, 2008.  **A236-A243**; **A216**.

Never for an instant did Griffin think that he would give up any benefits of being a United States Citizen when he agreed to work for Fluor and work side by side with our Armed Forces in Afghanistan.  **A076**.

On January 31, 2012, Griffin landed at Bagram Airfield in Afghanistan in order to clear through medical as required for his job.  And, on 2/01/2012, Griffin received vaccines.  **A085-A087**.  It was the first time he had received the influenza vaccine in 3-1/2 years.  But, it became <u>a new requirement by the DOD</u> that he receive it.  **A223, A225-A226**.

On or about February 21, 2012, Griffin commenced GBS symptoms, which prompted him to go to the emergency department in March. **A040**. His symptoms continued to escalate and he was diagnosed with GBS and later Chronic GBS/CIDP. **A042**.

Accordingly, Griffin timely filed his Petition for Compensation on or about April 23, 2013. Griffin's medical records and his declaration, both indicate that he is a "civilian government employee." **A075, A081**. This injury is the exact type meant to be covered by the Vaccine Act.

Although Griffin has filed his Defense Base Act ("DBA") claim naming Fluor as his employer, as he is required to do, Griffin asserts that he will be prejudiced if he is left with only a DBA remedy, as the DBA does not provide for pain and suffering and emotional distress and it does not provide approximately 33% of his wage losses. To date, even his past medical needs have not been reimbursed such as his attendant care, so his life care needs are not being well met. Griffin fully realizes that any benefits he receives from his DBA claim will be an offset to his Vaccine Program claim in the event he is eligible as a Petitioner. Griffin asserts that although he filed a DBA claim naming Fluor as an employer, such does not change the fact that the Army was, at minimum, a co-employer along with Fluor. **A268-269**.

Griffin provided evidence of how the Army exercised the <u>primary</u> control over his employment and duties.  **A269**.  Most, if not all, of his <u>contact on a **daily basis was with the military</u>**.  In addition to the daily contact, every week he met face to face with the top commanders, Sgt. Majors, and the Mayor over the entire base and discussed with them what the military needed to have done, progress made on previous action items, deadlines, materials needed, and issues needing to be resolved.  <u>The control over his daily work activities was by the Army</u>.  They were the ones calling the shots.  **A269**.  These meetings were conducted by and between various commanding officers and himself, as he was the site manager.  His Fluor supervisor, Cheryl Roberson, was not at these daily meetings.  Rather, she was running her own facility as well as trying to oversee the other 10 site managers.  Only once a week would Cheryl Roberson have a telephonic conference with the entire task force (all of the site managers of the various spaces) and discuss, <u>in general</u>, projects, progress, materials.)  **A269**.  But the reality was the Army was supervising and controlling everything Griffin did.  He was only reporting to Cheryl Roberson as to the status of what was going on.  She was not making the decisions as to what he would and should do at the military base.  **A269**.

Overall, the Army at the Afghanistan Base had, in comparison to Fluor, the most control over Griffin's day-to-day work activities and environment.  **A267-A271**.

The evidence provided by Griffin's declaration was corroborated by another witness, Decoree Sanders, who declared under oath that, among other things, he concurred with the structure and details outlined by Griffin within his supplemental declaration.  He corroborated that when you are on the military base, it is the military that has control over you and all the details and operations.  So much so, you feel as if you are a member of the armed forces instead of an employee of a subcontractor.  He confirmed that the details outlined within Griffin's supplemental declaration accurately reflect the amount of control asserted by the military.  **A272-A273**.

Griffin provided evidence that although Fluor technically hired him, the military had every bit of control to provide performance reviews, both good and bad about him.  If they wanted to get him off the base, they had the ability to do so.  Additionally, although the military did not, technically, hire him, it was their requirements that provided the guidelines of who got hired and who did not.  Fluor could only hire those people who met the requirements of the government.  Additionally, since it was their money, the military also had control over how much they were willing to spend on a site manager.  It was based on the

government's criteria as to who and how much was paid. The <u>economic realities</u> were that the Army controlled and supervised every aspect of Petitioner's site management and employment. It was the military who actually controlled the substantive aspects of the tasks that he did. It was, indeed, "client driven." Ms. Cheryl Roberson was only a "nominal supervisor"; and, she was not on site. **A270**. Accordingly, the reality was that the Army was truly a "joint employer" with Fluor.

Griffin worked at the military base in Afghanistan. He did not work at a Fluor facility. The military base was the government's. The government provided all of the equipment and materials. If they didn't sign off on a requisition, he did not get the equipment or material. If they wanted something, it was rubberstamped, as it was their money. **A270**. In regard to <u>equipment</u>, it was the Army who provided the materials. They had control over his office, furniture and supplies. If they needed his "container" that acted as his office, he was moved to another location upon their demand. It was the military that provided supplies such as calculators, pens and paper. He was there at the will of the Army. **A271**.

His work, as site manager for the military base, was, in fact, integral to the overall core mission. People like him are akin to the "Draft." Without subcontractors, like Griffin, the military base would not operate; or, they would have to go back in time and utilize their soldiers as they once did. He was hired to

11

do a specialized job that was part of the military's core mission under their direct supervision and control. **A271**, **A244-251**.

As site manager, Griffin had to have knowledge about budgeting, the military's network, supervising, ordering of supplies, communicating, as well as have basic knowledge regarding laundry, showers, latrines. He managed all departments and therefore needed to have knowledge of all aspects of each trade and craft including plumbing, electrical, and cooking. All management of all areas of this military network and all decisions that had to be made were made and based upon the Army Regulations. They were <u>not</u> based on Fluor procedures and protocol. Yet again, it was the Army that called the shots on how Griffin's decisions were made. "The Army regulations were the Bible." **A271**.

## V.    SUMMARY OF ARGUMENT

The legal issue is how to define "employee of the United States" within Title 42, the Vaccine Act. Griffin submits that it is legal error to apply Title 5's definition of employee, as Title 5, by its own terms, is applicable <u>only</u> to Title 5; and, nowhere does Title 42 indicate the acceptance of this definition. No prior cases exist applying Title 5's definition of employee to the Vaccine Act. In such an instance, when a term within a statute is not defined, the Supreme Court has clearly indicated that the function of a court is "to construe the language to give effect to the intent of Congress." Other statutory rules of construction exist that are

applicable in this case as well.  Moreover, the United States Supreme Court has indicated that in determining if a contractor has a joint employer, where Congress does not clearly indicate otherwise, courts should use common law agency principals to determine whether someone is an "employee".  The question then becomes, for this Court, whether utilization of common law agency principals are appropriate in order to define "employee of the United States" as used within Title 42.

Griffin further submits that Judge Bruggink committed legal error by failing to view the evidence presented on the motion for summary judgment in the light most favorable to him and to provide all justifiable inferences to be drawn in his favor as required by summary judgment law.  Indeed, Judge Bruggink didn't analyze this argument at all, indicating that the analysis of the issue begins and ends by the application of the definition of employee provided by Title 5.  **A007**. Since Griffin believes that legal error has occurred, this Court is respectfully called upon to interpret Title 42 "employee of the United States" as well as determine whether he is, in fact, an employee of the United States based upon the evidence presented and viewing the evidence in the light most favorable to him and drawing all justifiable inferences in his favor.  No facts were in dispute.  This is a pure legal issue.

## VI.   ARGUMENT

### A.  Standard Of Review

This Court may review final determinations of the CFC.  §300aa-12(f).  In reviewing an appeal from a judgment of the CFC in a Vaccine Act case, the Federal Circuit applies the same standard of review as the CFC can apply to the special master's decision.  *Andreu v. Sec'y HHS*, 569 F.3d 1367,1373 (Fed. Cir. 2009).  The Federal Circuit owes no deference to the decisions below concerning <u>conclusions of law</u>.  Thus, "[i]ssues of law – constitutional imperatives, <u>statutory construction</u>, procedural requirements – come to us for decision with little if any deference owed to or expected by the forums below."  *Munn v. Sec'y of HHS,* 970 F. 2d 863, 870, n.10.  (Emphasis added.)  [See also *Althen v. Sec'y of HHS, 1274,* 1278 (Fed.Cir. 2005.)].  In *Rooks v. Sec'y of HHS,* 35 Fed.Cl.1 (1996), the CFC was, likewise, called upon to determine whether the special master had properly interpreted the word "received"; and, it was found that the special master's decision was based solely on a statutory construction analysis.  As a consequence, the CFC, in *Rooks*, reviewed the special master's decision *de novo." Rooks, supra,* p.*4.  Likewise, in this case, no fact-finding occurred.  Even SM Millman concedes that the question of whether Griffin is eligible for compensation under §300aa-11(c) raises an issue of statutory interpretation, which is an issue of law.

14

**A017**.  Indeed, Respondent acknowledges that the Special Master assumed the truth of Petitioner's factual assertions.  **A428**.

### B.  Applicable Law

#### i.  <u>Standards Governing Summary Judgment</u>

The basic standard for granting or denying summary judgment is that the court must find that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *FRCP 56(c).*  Since summary judgment is a drastic remedy, it is therefore to be granted cautiously. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S. Ct. 2505, 2513-2514. (1986) <u>The court must view the evidence presented on the motion in the light most favorable to the opposing party: "The evidence of the non-movement is to be believed, and all justifiable inferences are to be drawn in his favor</u>." *Anderson, supra at 255, 2513.*  (Emphasis added.)  Federal Rules of Civil Procedure, 56(f) allows for additional discovery.

This Court has stated that "when a district court *grants* summary judgment, we review without deference to the trial court whether there are disputed material facts, and we review independently whether the prevailing party is entitled to judgment as a matter of law." *Suntiger, Inc v. Scientific Research Funding Group,* 189 F.3d 1327, 1333 (Fed. Cir. 1999.)  (Emphasis in original.)  (See also *Winstar Corporation v. The United States,* 64 F.3d 1531, 1539 (Fed. Cir. 1995) stating "We

review the Court of Federal Claims' grant of summary judgment under a *de novo* standard of review, with justifiable factual inferences being drawn in favor of the party opposing summary judgment.")

In Griffin's case, Respondent brought a Motion for Summary Judgment, which SM Millman *granted* and the CFC agreed.  Consequently, the *de novo* standard of review is the correct standard to be applied in this case.  Even if the Decision in this case was determined to be one of mixed question of law and fact, the Federal Circuit has likewise addressed this issue.  Applying the Supreme Court ruling, the Federal Circuit determined, "We believe that the court is in the best position for making the determination of reasonableness.  This court therefore holds that the objective determination of recklessness, even though predicated on underlying mixed questions of law and fact, is best decided by the judge as a question of law subject to *de novo* review."  *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc., 682 F. 3d 1003, 1006-07 (Fed. Cir. 2012)* citing to *Miller v. Fenton,* 474 U.S. 104, 113-114 (1985).

In this case, no evaluation of credibility or demeanor occurred and there were no factual determinations.  Consequently, this Court is, likewise, in the best position to determine these legal issues *de novo*.

### ii. Statutory Interpretation For 42 USC 300aa-11(c)(1)(B)(i)

§ 300aa-11(c)(1)(B)(i) addresses the eligibility requirements to file and receive

compensation through the Vaccine Program.  It states in relevant part as follows:

You must be a person who either

…

(II) received the vaccine outside the United States... and at the time of the

vaccination such person <u>was a citizen of the United States</u> serving abroad as a

<u>member of the armed forces</u> or otherwise as an <u>employee of the United States</u> or a

dependent <u>of such citizen,</u> or

….. (Emphasis added.)

   Where does this Court start its analysis on how to interpret this statute,

which does not define "employee of the United States" or "member of the Armed

Forces"?  The United States Supreme Court has given clear guidance and has held

that the function of a court in statutory interpretation is "to construe the language

so as to <u>give effect to the intent of Congress</u>."  *United States v. American Trucking*

*Ass'ns*, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063 (1940).  (Emphasis added.)  The

plain meaning of the words are followed if they sufficiently indicate the purpose of

the statute.  But, where the plain meaning leads to absurd, futile <u>or unreasonable</u>

<u>results</u>, "<u>plainly at variance with the policy of the legislation as a whole,</u>" the

Supreme Court has <u>followed the purpose</u>, <u>rather than the literal words</u>. *Id*. at 543,

60 S.Ct. at 1063-64; see also *Hellebrand v. Sec'y of HHS*, 999 F.2d 1565, 1570-71 (Fed. Cir. 1993). (Emphasis added.) "However clear the words may appear on 'superficial examination'," an investigation of the Vaccine Act's purpose is essential in construing the language in determining whether it is ambiguous. (See *American Trucking*, 310 U.S. at 543-44, 60 S.Ct. at 1063-64.) Even where language is seemingly unambiguous, the legislative history may be used to confirm that the court's interpretation of the statute reflects Congressional intent. *Rooks, supra*, (citing to *Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392, 395-96 (Fed. Cir. 1990); *Staples v. Sec'y of HHS*, 30 Fed. Cl. at 354 (1994). The Supreme Court has held that while the maxim *expression unius est exclusion alterius* (the expression of one thing is the exclusion of another), which could be used to narrowly construe the language within the statute, "may serve at times to aid in deciphering legislative intent, [it] long [has] been <u>subordinated</u> to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words <u>fairly permits</u> so as to <u>carry out in particular cases the generally expressed legislative policy</u>. *Id*. (citations omitted. Emphasis added.)

<u>Congress enacted the Vaccine Act in 1986 to address two primary concerns</u>: first, "that the [civil] tort system was failing to adequately compensate persons injured from [receipt of] vaccines," and second, "that there was too much of

vaccine-related tort litigation," having a chilling effect on manufacturers' willingness to continue to produce vaccines. *Cloer v. Sec'y HHS (Cloer I),* 654 F.3d 1322, 1325 (Fed. Cir. 2011) (*en banc*).  As this Court has noted, "Congress recognized that a "small but significant number" of people "had been gravely injured by vaccines," and "they and their families have resorted to the tort system for some form of relief."  *Figueroa v. Sec'y HHS,* 715 F.3d 1314, 1316 (Fed. Cir. 2013) (citing to H.R. Rep No. 99-908 at 4 (1986), reprinted in 1986 U.S.C.C.A.N. 6344, 6345).  Congress established the National Childhood Vaccine Injury Act Of 1986 ("Vaccine Act"), a no-fault compensation program designed to 'work faster and with greater ease' than the civil tort system.  *Figueroa,* at 1317, citing *Bruesewitz v. Wyeth LLC., U.S. __, __,* 131 S. Ct. 1068, 1073, 179 L.Ed2d 1 (2011).  The *quid pro quo* for the Vaccine Program, which was designed to stabilize the vaccine market, was the provision of significant tort liability protections for vaccine manufacturers. *Bruesewitz, supra* @ 1074.  In short, it was the intent "to insure the 'continued supply of vaccines that are vital to the public health,'" <u>by limiting litigation against vaccine manufacturers</u>.  See *McGowan v. Sec'y of HHS*, 31 Fed. Cl. 734, 738-39 (1994) (quoting H.R.REP. NO. 908, 99th Cong., 2d Sess. 1, 7 (1986), reprinted in 1986 U.S.C.C.A.N. 6344, 6348 (other citations omitted).

19

Congress intended the Vaccine Act "to compensate injured persons quickly and fairly", with "relative certainty and generosity of compensation." *Figueroa* at 1317. As remedial legislation, the Vaccine Act "should be construed in a manner that effectuates its underlying spirit and purpose." *Cloer v. Sec'y HHS (Cloer II),* 675 F.3d 1358, 1362 (Fed. Cir. 2012) (*en banc*) (citations omitted).

Petitioner submits that the term "a member of the Armed Forces or otherwise as an employee of the United States" should be given a broader interpretation in light of the fact that the United States government and armed services routinely utilize contractors to assist in their core mission and asserts tremendous control over them**. A244-A254**. To narrowly construe this provision to exclude United States citizens, who are employed by contractors who provide essential services to our Armed Forces, whose services are controlled by the DOD, would deprive an entire class of citizen from eligibility and contradict the legislative intent to offer fair compensation and to avoid lawsuits against vaccine manufacturers.

A similar issue was previously decided in a 1996 Vaccine Program case in *Andrews v. Sec'y of HHS,* 1996 WL 300644 (1996). SM Abell was called upon to interpret "an employee of the United States" upon which petitioner's eligibility to participate in the Vaccine Program hinged. The issue determined in *Andrews* is the same issues before this very Court. In *Andrews,* it was acknowledged that the term

"employee" was not defined within the Vaccine Act; and, the United States Code's various definitions of employee were anything but consistent.  It was also acknowledged that ambiguity may be dispelled by referring to the purpose of the statute in question.  *Andrews, supra,\*4*.  SM Abell further noted that one's status as a federal employee <u>need not be formal</u> and <u>nothing in the "employment provision" of the Vaccine Act indicates that an employment contract with the United States as a signatory or payor plays an especially significant role</u>.  *Andrews, supra*, \*4, 5. (Emphasis added.)  SM Abell ultimately held that, for purposes of this Vaccine Act, the definition of "employee" encompasses those who act, formally or informally, in an official capacity on behalf of the United States, or <u>who performs services for the United States similar to those who are otherwise considered employees of the federal government, regardless of the source of salary or wage</u>.  *Id.*

According to various Commentaries, the relationship between the DOD and contractors has increasingly become a subject of discussion.  **A244-A251**.  The last two decades have been marked by numerous political efforts to reduce the size of the federal workforce and declare the end of the "era of big government."  These efforts left the federal government strapped for personnel and resources and have forced many agencies to increasingly rely on service contractors in general, and personal services contractors in particular, to fulfill their mandates. *Id.*  These

positions were <u>traditionally reserved for government employees</u>.  The result is a

phenomenon known as the "blended workforce," <u>in which the practical distinctions</u>

<u>between contractors and civil servants in the federal workplace has become</u>

<u>opaque, if not completely unrecognizable</u>.  *Id.*  For example, some federal courts

have even held that contractors may be considered <u>de facto federal employees</u> for

employment discrimination law purposes.  **A248-A254** citing to *Harris v. Atty.*

*Gen.*, 657 F. Supp.2d 1, 12 (D.D.C. 2009); *King v. Dalton,* 895 F. Supp. 831, 837

(E.D. Va. 1995).  In the article "Suing the Government As A 'Joint Employer'

written by Schooner and Swan of the George Washington University Law School,

*id.*, the authors analyzed that the lawsuit, in *King*, starkly established the

proposition that the Federal Government could no longer shield itself from liability

simply by asserting it does not directly employ or pay contractor personnel.

In determining if a contractor has a joint employer, the Supreme Court has

directed that <u>where Congress does not clearly indicate otherwise</u>, courts should use

common law agency principals to determine whether someone is an "employee."

*Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322-23 (1992).  The Common

Law Agency test was summarized as follows:

> "In determining whether a hired party is an employee under the
> general common law of agency, we consider the hiring party's right
> to control the manner and means by which the product is
> accomplished.  Among the other factors relevant to this inquiry are
> the skill required; the source of the instrumentalities and tools; the

location of the work; the duration of the relationship between parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; a hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; the tax treatment of the hired party."

*Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322-23 (1992)  "No one of these factors is determinative." *Cmty. for Creative Non-Violence v. Reid,* 490 U.S. 730, 752 (1989)  See also *Nationwide, supra.* at 324.

"Heavy reliance on the language of a <u>contract</u> to show that plaintiff was not an "employee" <u>does little to advance this inquiry regarding the "analysis of the</u> <u>'economic realities' of the work relationship</u>." *Harris, supra* at *10.  (Emphasis added.)  All contracts manifest the parties' intent, <u>they do not necessarily reflect</u> <u>"economic realities</u>." *Id.* (Citations omitted.) (Emphasis added.)

## VII. APPLYING TITLE V'S DEFINITION OF EMPLOYEE TO THE VACCINE ACT WAS LEGAL ERROR

This case is a case of first impression before the Federal Circuit.  The Federal Circuit has not weighed in on how to define "employee of the United States." SM Millman conceded that the Vaccine Act does not define "employee". **A021**.  Judge Bruggink's Decision implicitly agrees. **A001-A010**.  However, SM Millman failed to interpret the statute pursuant to the legislative intent; and, Judge Bruggink short shrifted the issues by finding that the definition of employee under

Title 5 applied to this case, thus avoiding further analysis. **A007**. *De novo* review
is appropriate.

 <u>First,</u> Judge Bruggink found that Title 5's definition of "employee" applies
to this case. **A007.** However, applying Title 5's definition is <u>not</u> supported by the
language of the statute. By its very terms, 5 U.S.C. § 2105 indicates that the
definition of employee to follow is **"for the purpose of [that] title."** It is not
statutorily extended to apply to the Vaccine Act in Title 42. Conversely, the
Vaccine Act nowhere provides that its definition for "employee" draws from Title
5.

 <u>Second</u>, a close grammatical reading of the statute's surrounding language
also sheds light on the meaning of the term "an employee of the United States."
Immediately preceding the phrase at issue, is the requirement that "such person
was a citizen of the United States serving abroad as a member of the armed
forces." § 300aa-11(c)(1)(B)(i)(II). The phrasing here is specific with four (4)
requirements placed on the potential petitioner. Namely, the person must be (1) a
citizen (2) of the United States (3) serving abroad (4) as a member of the armed
forces. However, as the sentence progresses, there is language of expansion. The
dictionary definition of "otherwise" is "something or anything else," or, "in all
ways except the one mentioned." "otherwise" *Merriam-Webster.com*. 2011.
http://www.merriam-webster.com (Sept. 19, 2014). In effect, the words "or

otherwise" connect a term with a narrow definition to a term with a broader definition. Thus, the phrase "employee of the United States" is understood to stand for a broader class of people, a class that encompasses many ways one could work for the United States abroad, just not as a member of the armed forces.

Looking at the statute's language still further, one notes the third type of individual that may petition. Specifically, a person petitioning the Vaccine Program must be "a dependent of such citizen." § 300aa-11(c)(1)(B)(i)(II). This phrase immediately follows the phrase "employee of the United States" and serves to modify it as well. Who is "such citizen?" The individual described immediately before. Thus, the Vaccine Act expressed that the undefined "employee of the United States" must be a United States citizen. 42 U.S.C. § 300aa-11(c)(1)(B)(i)(II). Any interpretation of the phrase, then, must be one that is consistent with this requirement in the statute. However, 5 U.S.C. § 2105 clearly contemplates individuals who are not United States citizens. For instance, one could be categorized as an employee under § 2105(c), yet not be a citizen. Such instance is observed in another section of Title 5, which provides a resolution in situations "of disability or death, resulting from injury, . . . occurring to an employee of a non appropriated fund instrumentality described by section 2105(c) of this title who is not a citizen . . . ." 5 U.S.C. § 8172. It is contemplated, then, that one may be an employee under §2105(c), but not a citizen. Moreover, there is

no clear statement in §2105 that the employee, as defined, must also be a United States citizen.  This difference in approach to a citizenship requirement does not make Title 5's definition of employee compatible with the undefined "employee of the United States" of the Vaccine Act in Title 42.  The Vaccine Act's additional requirement that the petitioner must be a United States citizen shows that Congress contemplated a definition of "employee of the United States" that was different from Title 5's definition.

Finally, it is important to note that Respondent claims, and Judge Bruggink seem to agreed, that "employee of the United States" is a term of art. **A007**.  As a term of art, they argue, one cannot interpret it any other way than as stated in Title 5.  Yet, 5 U.S.C. § 2105 uses the term only in its simplest form – "employee." Even if one assumes the Title 5 definition is an adequate expression of the term as used in the Vaccine Act, the terms of art must be identical.  However, one can plainly see that they are not.

Griffin submits one cannot reasonably find that Title 5's definition of "employee" is an appropriate definition of the term at issue in this case.  Title 5's definition has not been extended to, or included in, the Vaccine Act's definition. Title 5's definition allows for non-citizen employees, whereas the Vaccine Act specifically requires a showing of U.S. citizenship.  And, the Vaccine Act's usage of the term does not invite a reading of it as a term of art.

After finding that 5 U.S.C. § 2051 was the intended definition of the phrase "employee of the United States" in the Vaccine Act, Judge Bruggink decided that Griffin was not an employee of the United States because "federal employees' rights are defined by Title 5 and not by . . . other statutes not specifically made applicable to federal workers." **A007**. This decision is problematical. Essentially, Judge Bruggink put the cart before the horse. He tried to determine whether Griffin, as a federal employee, had a right to petition under the Vaccine Act. However, Griffin is not asking that question. Rather, Griffin asks that he be considered an employee of the United States as used in the Vaccine Act's language. There is a difference. <u>Griffin is not trying to establish he is a federal employee in order to receive the resultant rights and benefits that Title 5 federal employees have</u>. Griffin simply wants to be considered an employee of the United States as contemplated in Title 42 and for the limited purpose of filing a Vaccine Act petition.

Judge Bruggink's case law quoted in support of his decision only furthers the notion that the outcome is illogical. The cases cited by Judge Bruggink in support of his decision that Griffin is not able to file a petition under the Vaccine Act are cases that deal with individuals who are unquestionably deemed federal employees and who are now seeking <u>some sort of entitlement or benefit</u>. See, e.g., *Doe v. United States*, 513 F.3d 1348 (Fed. Cir. 2008); *Billings v. United States*, 322

F.3d 1328 (Fed. Cir. 2003).  **A019**.  Griffin's situation contrasts with these cases

greatly because he is hoping to be considered an employee of the United States

under the Vaccine Act and he is seeking compensation for his injuries.  There is no

parallel between the classification of Griffin and the individuals in the cases cited

(in that Griffin is not presumptively a Title 5 federal employee, while the cases cite

individuals who are unquestionably).

Neither is there a parallel between the type of award they are seeking or their

underlying qualification for it.  Specifically, Griffin is seeking compensation for a

loss resulting from a vaccine injury.  Meanwhile, the cases discussed in the

Decision pertain to individuals seeking an <u>entitlement under a federal employee</u>

<u>benefit program</u>.  The nature of the Vaccine Program is principally different than

that of an employee benefit program.  The Vaccine Program is set up as a "<u>no-fault</u>

<u>compensation program</u>" intended broadly for "victims injured in connection with .

. . [vaccines]." H.R.REP. NO. 908, 99th Cong., 2d Sess. 1, 7 (1986).  It is

fundamentally different from <u>employee benefits</u> contemplated by Title 5.  The

Vaccine Program must be viewed properly.  As a compensation program, it is more

broadly applicable in that, in a general sense, one must simply be an individual

injured by vaccines.  Thus, Judge Bruggink's decision is too broad in its sweep.

Last, Judge Bruggink inserted Title 5's definition of "employee" for the

same term at issue within the Vaccine Act.  He did not provide a proper argument

for doing so.  He certainly failed to provide statutory, legislative or case law supporting Title 5's application to the case at bar, a Title 42 case.  Indeed, a search for previous application of Title 5 to Title 42 cases and circumstances at bar revealed no previous court had done so.  SM Abell's decision in *Andrews, supra,* outlined above, came the closest, but, obviously that decision rejected the application of Title 5's definition as it did other United States Code Sections that defined "employee."  The *Andrews* decision looked at <u>several</u> United States Code sections: the Federal Employee Compensation Act under Title 5, the Federal Tort Claim Act, the Peace Corps volunteers employee status, and Volunteers in the Parks Act, who received employee status for some purposes.  The *Andrews'* decision finally concluded "like a chameleon adapting its color to reflect its environment, the word "employee" derives its meaning from the surrounding statutory terms and purpose. *Andrews, supra* at *4.  Given the number of definitions of "employee" depending on the various statutes within the United States Code, Petitioner contends that the decision to apply Title 5's definition to this case was improper as it was not supported by case law, legislative intent, language within its own statute, or any type of statutory interpretation construction.

In conclusion, Judge Bruggink's Decision is one that is not supported by the Supreme Court directives on interpreting undefined terms.  By inserting Title 5's "employee" definition into the "employee of the United States" phrase as stated in

the Vaccine Act, Judge Bruggink disregarded the statutory language of both Titles (Title 5 and Title 42) and failed to resolve the matter before the court in a way that was supported by case law or statutory interpretation.

## VIII.  PROPER INTERPRETATION OF TITLE 42'S EMPLOYEE OF THE UNITED STATES

As discussed above, when interpreting a statute, the court must first "construe the language so as to give effect to the <u>intent of Congress</u>." *United States v. American Trucking Ass'ns*, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063 (1940).  To do this, courts may follow the plain meaning of the words. *Id*. at 543, 60 S.Ct. at 1063-64.  However, if the plain meaning produces absurd, futile – or even simply unreasonable results "plainly at variance with the policy of the legislation as a whole" – the court should follow the purpose of the act, instead of the literal words. *Id*.  Beyond the purpose consideration requirement, the court may also then consider the context of the undefined term. *Id.* at 545.  An analysis of the grammatical reading of the statutory language, taken together with legislative intent, plays a role in deducing meaning in the context.  *U.S. v. X-Citement Video*, 513 U.S. 64, 68, 70 (1994).  Furthermore, when faced with the specific issue of defining the statutory use of the term "employee," and when the congressional intent does not indicate otherwise, the court should use the common law agency test.  *Nationwide, supra.* at 323.

The statutory interpretation analysis outlined above, Petitioner submits, is the proper way to consider this particular statutory interpretation problem.

In the cases cited above, the Supreme Court provided guidance for interpreting a term that is not defined by the statute in which it appears. Such guidance was ignored by Judge Bruggink when reaching the decision that "federal government employees are governed by Title 5." **A007**. Interestingly, even the cases cited by Judge Bruggink show an examination of legislative intent when considering statutory questions. See *Doe v. United States*, 513 F.3d 1348, 1357 (Fed. Cir. 2008); *Billings v. United States*, 322 F.3d 1328, 1333 (Fed. Cir. 2003). A427. Yet, Judge Bruggink failed to make this a part of his consideration, as is required.

The "plain meaning" of the words might lead one to believe that Griffin, whose employment was heavily directed and overseen by a department of the United States, though he perhaps was technically employed by Fluor, is not directly an employee of the United States. However, such a deduction would be an "unreasonable result" "plainly at variance with the policy of the legislation as a whole." To understand why this is an unreasonable result, consider that the policy of the Vaccine Act is to "offer fair compensation to victims injured in connection with childhood vaccination programs" and to "insure the 'continued supply of vaccines that are vital to the public health'" by limiting litigation against vaccine

manufacturers.  See *McGowan v. Sec'y HHS*, 31 Fed.Cl. 734, 738-39 (1994)

(quoting H.R.REP. NO. 908, 99th Cong., 2d Sess. 1, 7 (1986)).  See also *Cloer*,

*supra*; *Figueroa*, *supra*; and *Bruesewitz*, *supra*. Griffin perfectly fits the

description of the individuals the Vaccine Act meant to take under its wing.

Specifically, he is a vaccine-injured U.S. citizen who would otherwise have to

litigate against a vaccine manufacturer.  One would unreasonably defeat the policy

of the Vaccine Act if one were to read the undefined term narrowly so as to leave

Griffin, and others within the same class of people, without full recourse under the

Vaccine Act.  Thus, the plain meaning of the words leads one to an unreasonable

result and the next stage of the interpretation analysis must be considered.

Because the plain meaning of the word "employee" produces an

unreasonable result "plainly at variance with the policy of the legislation as a

whole," the Court should next look to the purpose.  Here, the purpose of the Act is

"to achieve optimal prevention of human infectious diseases through immunization

and to achieve optimal prevention against adverse reactions to vaccines."  42

U.S.C. § 300aa-1.  Notably, the stated purpose does not mention an intent to

exclude classes of individuals from its aegis.  This seems to indicate a more

inclusive approach.  At the very least, the lack of a stated concern for a more

inclusive approach is significant.

Thus, in deducing the meaning of the phrase at issue, it is clear that the term was meant to be more inclusive than exclusive.

Considering the <u>public health purpose</u> and focus of the Act, the Court may rightfully consider the Vaccine Act's context of the undefined phrase. Besides being a member of the armed forces or "otherwise an employee of the United States," one may also petition the Vaccine Program if one received a U.S. manufactured vaccine outside the United States and returned to the United States within 6 months. §300aa-11(c)(1)(B)(i)(III). The individual would not have to be a member of the armed forces or "otherwise an employee of the United States." *Id.* This must be because the statute "presumes the non-federal employee's case will adversely affect the American vaccine market if he does not participate in the Program." *Andrews v. Sec'y HHS*, 1996 WL 300644 (1996). On the other hand, the armed forces member or the "employee of the United States" does not need to show he received a U.S. made vaccine nor does he have to return within 6 months. The difference in this requirement "must lie in the federal government's authority to locate individuals extra-territorially in order to accomplish national objectives." *Id.* Notably missing is a contextual indication that these requirements were intended to rest on federal/non-federal employee distinctions. Clearly, the requirements taken together show an emphasis placed on the government's control

over vaccinated individuals, especially those who might come in contact with the citizens of the United States.

And, as outlined above, a close grammatical reading of the statute's surrounding language also sheds light on the meaning of the term "an employee of the United States." In effect, the words "or otherwise" connect a term with a narrow definition to a term with a broader definition. Thus, the phrase "employee of the United States" is understood to stand for a broader class of people, a class that encompasses many ways one could work for the United States abroad, just not as a member of the armed forces.

Also, as discussed above, the congressional intent with this Act was to promote public health while providing compensation to vaccine-injured individuals and maintaining the stability of the vaccine market. H.R.REP. NO. 908, 99th Cong., 2d Sess. 1, 7 (1986). As acknowledged by SM Millman, a stated legislative purpose of the Vaccine Act was the federal government's "responsibility to prevent the spread of infectious diseases from other countries into the United States and between States within its own borders." H.R. Rep. No. 99-908, at 5 (1986). **A018.** There is no mention of an intent to exclude classes of individuals based on thin lines of employment status. See *id.*; 42 U.S.C. § 300aa-1. Accordingly, the Court must evaluate and determine, for the first time, how to define "employee of the United States" in the context of the Vaccine Act within Title 42. And, the

Supreme Court has directed that where Congress does not clearly indicate

otherwise, courts should use common law agency principals to determine whether

someone is an "employee." *Nationwide, supra.* at 322-23.

As will be discussed below, using the common law agency test, Petitioner

contends that the amount of control exerted by the DOD/Army over Griffin's work

rose to the level that allows him to be considered an "employee of the United

States" using the common law agency test. This is especially so, when the evidence

provided, is reviewed in the light most favorable to him, as is required.

In sum, after following the appropriate statutory interpretation analysis, it is

clear that the Vaccine Act was written with the intent to include an individual such

as Griffin.  The plain meaning of the statute would lead to unreasonable results if

decided otherwise.  And, the purpose and context of the Vaccine Act shows that

the definition contemplated by the Vaccine Act is a broad one.  Against the

backdrop of this inclusive intent, Griffin should be found to be a proper petitioner

after evaluating his situation against the common law agency test.  By failing to

analyze the case in this fashion, legal error occurred.  This Court may review the

granting of summary judgment *de novo* without deference to the trial court; and,

this Court may review independently whether the prevailing party is entitled to

judgment as a matter of law."  *Suntiger, Inc v. Scientific Research Funding Group*,

189 F.3d 1327, 1333 (Fed. Cir. 1999.)  (Emphasis in original.)  (See also *Winstar*

*Corporation v. The United States*, 64 F.3d 1531, 1539 (Fed. Cir. 1995).

**IX.    LEGAL ERROR WAS COMMITTED IN THE APPLICATION OF
        MOTION FOR SUMMARY JUDGMENT LAW.  WHEN COMMON
        LAW AGENCY IS APPLIED CORRECTLY, EVIDENCE SHOWS
        THE ARMY EXERTED SUBSTANTIAL CONTROL OVER
        GRIFFIN.**

Millman consistently failed to regard Griffin's evidence as true and failed to

provide inferences favorable to him as required by summary judgment law.

Petitioner submits this was legal error.  In fact, SM Millman took an adversarial

role and provided her own Internet research to support, in part, her decision

granting summary judgment and dismissing Petitioner's petition.  No opportunity

to respond to the new research and arguments was provided.

Petitioner further submits that Judge Bruggink also committed legal error by

sidestepping the issue entirely, opting to simply determine that the definition of

"employee" was defined by Title 5.  "Petitioner's right to compensation under the

act begins and ends there." **A008**.  And, if error occurred it was harmless.  **A009**.

Such is far from true.

In this case, the evidence showed that the Army was, at minimum, the co-

employer of Griffin.  Griffin provided substantial uncontroverted evidence

including (1) his declaration and attached exhibits dated August 26, 2013 (**A074-

A077**), (**A088-A243**), (2) Commentaries addressing the relationship between

contractors and the government (**A244-A254**), (3) a supplemental declaration of Griffin dated December 18, 2013 (**A267-A271**), and (4) declaration of third-party, Decoree Sanders, (**A272-A273**) corroborating that the Army exerted such control over the details and operation that one felt you were a member of the Armed Forces.  **A273**.

The legal errors Petitioner believes to have been committed are intertwined with SM Millman's analysis of the common law agency test – a test involving several factors.  Thus, Petitioner will outline each legal error below.

### A. SM Millman Routinely Failed to Regard as True Griffin's Evidence on the Federal Government's Control Over the Manner and Means of His Employment

The first issue outlined by the United States Supreme Court in determining if a contractor has a joint employer is the "hiring party's right to control the manner and means by which the product is accomplished."  *Nationwide, supra* at 322-23. SM Millman concurs that this factor is often the most important.  **A025**  Despite the substantial evidence, SM Millman routinely concluded that even under common law agency analysis, the federal government did not exert enough control over the manner and means of Petitioner's employment to qualify as his employer or joint employer stating that most of the aspects of his employment were controlled by Fluor, not the Department of Defense.  **A021**.  This conclusion is not supported by the undisputed facts and evidence presented by not only Petitioner

but by another witness as well.  **A267-A273**.  This conclusion is also not supported by the applicable rules and regulations.  In addition to the declarations submitted evidencing control over every aspect of Griffin's employment by the DOD/Army, excerpts from the Defense Contingency Contracting Handbook[3] were provided.  It states, the Army holds **primary responsibility** for program policy, guidance and direction…. **A334-A335**.  The Army Material Command, through its subordinate Army Sustainment Command, serves as **the principal agent** responsible for LOGCAP administration, management, and execution.  *Id*.  It goes on further to state that DOD provides **overarching guidance** regarding the integration of defense contractor personnel into contingency operations.  **A336**.

The words "overarching" and "primary responsibility" have meaning and absolutely show that the DOD had, at minimum, joint control, if not sole control, over Griffin's work activities.

Additionally, the Army controlled "how" work was done.  The Army Regulation 715-9 (**A342-A378**) states, in relevant part, where the contractor company supervisor is not located within the area of performance … the COR will … monitor the contract employee's performance to ensure it is consistent with the

---

[3] Defense Contingency Contracting Handbook, October 2012 ("DOD Contingency Handbook").

terms and conditions of the contract."[4]  **A356 §4-3**.  As Griffin's declaration states, the Fluor supervisor was not located within the area of his performance.  **A269 ¶ 7.** Moreover, only the contracting officer has the authority to direct contractor personnel.  In short, the commander must manage contractor personnel through the contracting process.[5]  **A303**, **A355**.

The Army was hands on in terms of performance and evaluations.  Such control included, among other things:  Verifying that the work completed and the materials purchased are required under the contract.  Ensuring that the contractor is paid for acceptable performance <u>and not paid for unacceptable performance</u> (supplies or services).  And, thoroughly and accurately complete the required <u>performance reports</u> so that the contracting officer can properly evaluate the contractor. **A394-395**.  The above rules and regulations are counter to SM Millman's conclusion that most of the aspects of his employment were controlled by Fluor, not the Department of Defense. **A030-A031**.

Millman's recitation of the fact that "Petitioner's management decisions as site manager "were influenced" by Army regulations, was inaccurate.  **A013**. Rather, Griffin declared that "all management of all areas of this military network and all decisions that had to be made were made and based upon the Army

---

[4] Army Regulations 715-9.
[5] The Defense Contingency COR Handbook Chapter 2 page 30,September 2012.  Also see Army Reg, p.10.

regulations…. "It was the military that called the shots on how my decisions were made."  "The Army regulations were the Bible."  Griffin's decisions were not merely "influenced" by the Army regulations.  His decisions were "dictated" by the Army regulations and DOD personnel.  The government set the standard on everything through the Army regulations.  **A270-A271 ¶ 12**.

Millman went on to state that traditional agency analysis tends to focus on the level of control over the day-to-day physical details of the agent's job.  By illustration, she cited to the Restatement Second, which defined an agent as "a person employed to perform services in the affairs of another and who with respect to the *physical conduct* in the performance of the services is subject to the other's control or right to control."  **A026**.  The Comment E of the Second Restatement elaborates on this point in relevant part as follows:  those rendering service but retaining control over the manner of doing it are not servants....[6] **A025**.

Millman, in analyzing the "physical conduct", looked at Petitioner's undisputed evidence provided in his declaration, including that his day-to-day activities were controlled by the military, that his <u>daily</u> contact was with military members and that he had weekly meetings with military commanders, in which they discussed action items, progress on previous action items, deadlines, and

---

[6] The Restatement Second and the comments to it were not part of the arguments presented by either Respondent or Petitioner.

materials needed.  She also recited that the military officers instructed him as to his

duties and that the government, through their regulations, controlled how his job

duties were done and how decisions were made.  HOWEVER,SM Millman did not

find these aspects of control to be determinative of an employer/employee

relationship explaining that agency analysis tends to focus on the principal's

control of the *physical details* of a servant's actions.  **A026**.  <u>Without any evidence

or personal knowledge whatsoever</u>, SM Millman asserted that military officers

may have been directing Petitioner as to the results they wanted him to achieve,

but, Petitioner had not presented facts that the military controls the "manner of"

achieving those results."  **A026**.  This conclusion is legal error based upon the

evidence provided not only in Griffin's declaration (**A269 ¶ 7**) but also evidence

provided that all decisions made were based upon the army regulations.  "It was

the military that called the shots on how my decisions were made."  "The army

regulations were the Bible."  (**A269 ¶ 12**.)

And again, SM Millman never asked for any additional details before

making up her own facts.  And, although she did independent Internet research, she

definitely overlooked The DOD Contingency Contracting Handbook, which is

online.  Indeed, this very same handbook outlines how much control the DOD has,

including performance work statements that describe the required results in clear,

specific and objective terms with measurable outcomes.  **A339**.

Petitioner provided evidence that the Army held "primary responsibility" including for direction as previously indicated; and, that they served as the "principal agent" responsible for administration, management and execution. Petitioner also showed that the DOD provided "overarching guidance" regarding the integration of defense contractor personnel into contingency operations. And, pursuant to Army regulation 715-9, the Army had "principal" responsibility for the strategic direction and providing the "overall supervision" for manpower and Reserve affairs across the Army components (active Army, guard, reserve, civilian, and contractor.) **A346 §1-4**. And, as previously discussed, when the contractor company supervisor is not located within the area of performance (such as in this instance) the COR will … monitor the contract employee's performance …. Again, substantial and more than equal control is exerted by the DOD and the Army.

On the other hand, no evidence supports the conclusion made by SM Millman that Griffin exercised independent judgment in his management decisions. **A026**. The evidence was to the contrary, as outlined above and throughout his entire declaration. **A267-A271**. Specifically, Griffin testified that the government determined his day-to-day operations. The government, through their regulations, controlled how his job duties were done and how decisions were made… All management of all areas of this military network and all decisions that

had to be made were made and based upon the Army Regulations.  They were not
based on Fluor procedures and protocol.  Yet again, it was the military that called
the shots on how his decisions were made.  "The Army regulations were the
Bible." **A270-271, ¶ ¶ 11, 12**.  Thus, the unfavorable interpretation of the evidence
is legal error.  The overwhelming unopposed evidence, in fact the only evidence,
shows that the government exercised control over the details, manner and means of
Petitioner's work and that Griffin did not exercise independent judgment in his
management decisions and therefore did not have control over the physical details
of his actions.

In support of her decision, SM Millman went on to state that rather than
providing factual details indicative of control, Petitioner provides mostly
conclusory statements that the government was "calling the shots."  Petitioner
believes the evidence is contrary to this conclusion.  However, had the Special
Master wanted additional detail, all the court had to do was to ask and not decide
the case prematurely and without giving due process.

Then, in contradiction to the determination that the military did not have, at
least, equal control, SM Millman conceded that Petitioner met weekly with both
his Fluor supervisor and with government officials, thus indicating that Fluor had
at least an equivalent level of control over the details of his work.  **A026**.  The
conclusion that the Army had equal control was partly correct.  But, the

interpretation of the evidence is incorrect in that the evidence very much indicated that his <u>day-to-day contact</u> was <u>with the military</u> with minimal weekly oversight by his off-site Fluor supervisor.  This interpretation of the undisputed facts failed to regard as true, much less consider, Griffin's evidence.  And, it certainly did not interpret the evidence in a light most favorable to Petitioner, which is legal error. Moreover, it is contrary to the evidence that the telephonic conferences with the off site Fluor supervisor were generalized discussions of progress and materials.  He was only reporting to the supervisor as to the status of what was going on.  "She was not making the decisions as to what Griffin would and should do at the military base."  "The reality was the military was supervising and controlling everything I did."  **A269 ¶ 7.**

Millman conceded that the government exhibited some control over petitioner's employment.  Such as setting hiring qualifications, pass DOD health, security, and background clearances, maintaining control in certain areas related to safety of contractor personnel, retaining federal jurisdiction over contractor personnel in the event that they commit a crime while abroad and serving along the Armed Forces….**A025**.  SM Millman accepted the assertion that the military officers instructed him as to his duties.  She also accepted that "it is unsurprising that much of petitioner's daily contact was with military members"…. **(A026)** Although SM Millman concluded that Petitioner had meetings with Army officials,

44

was influenced by Army regulations **(A020)**, required security and medical clearances, supplied the location and tools for employment, engaged in weekly meetings and daily contact with Petitioner, and contributed to Petitioner's evaluations, among other things **(A031)**, she still concluded that the Army did not exert sufficient control to be a joint employer. *Id*.

The primary issue and the evidence presented of who had the "right to control the manner and means by which the product is accomplished", Petitioner maintains, tips in favor of the Army having the primary control.

### B.  Source of Instrumentalities and Tools, Location of the Work

Other issues to be considered, according to *Nationwide,* include the source of instrumentalities and location of the work. SM Millman analyzed these additional factors and <u>conceded</u> that the government furnished the place of performance and property necessary. **A027-A028**.  Several factors now exist, some conceded by SM Millman while others are subject to the Special Master's legal error.

### C.  Role in Hiring, Paying, and Pre-Deployment Evidence of Control by the Army

Another factor to be considered, pursuant to *Nationwide,* is the role in the hiring.SM Millman analyzed the level of control exhibited and <u>**conceded**</u> that the government exhibited "some" control over Petitioner's employment such as setting hiring qualifications, passing DOD health, security and background clearances,

45

having certain regulations related to safety of contractor personnel and retaining

federal jurisdiction over contractor personnel in the event that they commit a crime

while abroad and serving alongside the armed forces.  **A025**.  Based on these facts,

one could justifiably infer that the government exerts control over Griffin in a

significant way. However, SM Millman viewed these areas of control reserved by

the government as not highly significant in terms of the employer/employee

relationship.  *Id.*  In doing so, SM Millman failed to draw a justifiable inference in

favor of Griffin.

Millman found that although the government required that Petitioner pass

various clearances, Fluor was the responsible party for ensuring that these criteria

were met. SM Millman went on to point out that it was Fluor, not the Army, who

notified Petitioner when he passed his security clearance.  As SM Millman pointed

out, the contract provided that Fluor was responsible for obtaining passports, visas

and other required documents for its employees.  **A026**.  However, in focusing

only on the contract, SM Millman failed to consider Griffin's evidence that  he was

issued, by a government employee, a government ID card (CAC) which is

considered government furnished equipment per Defense Logistics Agency

Instruction DLAI 4311:

> A government official will confirm the individual's eligibility and the
> need for a CAC.  The government sponsor must be a government

<u>employee</u> and cannot be a contractor, the applicant's outside private employer or a third party organization.[7] **A403 ¶ d**.

And since Griffin, was a CAAF employed in support of a DOD mission, he was a DOD-sponsored personnel. Therefore, a Contracting Officer was required to ensure contracts include a requirement that CAAF must meet theater personnel clearance requirements and must obtain personnel clearances prior to entering applicable contingency operations.[8] **A314 ¶ b**.

It is not sufficient to just look at one side of the arrangement and documents, especially if a special master is going to do independent Internet research. Griffin's undisputed evidence must be believed and he must be given all justifiable inferences. The United States government/Army/DOD rules and regulations, at minimum, show a joint employment arrangement and sizable control over <u>every aspect</u> of Griffin's employment from beginning to end.

Millman also considered the **method of termination** and conceded that the evidence presented by Griffin indicates that the United States Army officials <u>had control</u> over his performance reviews <u>and had the power to have him fired</u>, but seemed to require more. **A028**. This is odd, given the concession. Nevertheless, SM Millman never asked for additional details. The evidence presented went undisputed and all justifiable inferences were to be determined in his favor. What

---

[7] Defense Logistics Agency Instruction DLAI 4311
[8] Department Of Defense Instruction, No. 3020.41, December 20, 2011 Enclosure (2).

Griffin did specifically state was that although Fluor technically hired him, "the

military had every bit of control to provide performance reviews, both good and

bad about me.  If they wanted to get me off the base, they had the ability to do so.

In fact, they had impact on my increases of responsibility, which also meant

increases in salary by virtue of giving accommodations and certificates of

appreciation.  However, comments worked both ways.…"  **A269 ¶ 8**.  He also

provided the instruments that indicated their ability to impact his employment.

And, as previously indicated, when a supervisor is not on site, as in this case, the

COR will... monitor the contract employee's performance to ensure it is consistent

with the terms and conditions of the contract.  SM Millman conceded the

government can direct Fluor to "remove" contract personnel for failure to comply

with the contract, yet, she failed to acknowledge the reality that the government

has significant <u>power to fire or cause one to be fired</u>.  Also, SM Millman failed to

look at various rules and regulations that outline remedies in regard to poor

contract performance as follows:

> Contract quality surveillance is an essential activity. …They <u>retain</u>
> <u>responsibility for mission accomplishment even if</u> it decides to
> <u>employ contractors</u>. …These CORs function as the eyes and ears of
> the contracting officer and as liaisons between the Government and
> contractors when executing surveillance responsibilities. Most
> important, CORs <u>provide essential oversight</u>. … CORs monitor
> contract performance....The COR <u>oversees contractor</u>
> <u>performance</u>….The COR also identifies when a contract needs
> contracting officer intervention (e.g., payment support, requirement

changes, <u>and corrective actions</u>)….Typical **COR** post-award responsibilities include Monitoring contract performance … Handling unsatisfactory performance….Document deficiencies in performance. **A380**, **A382**, **A384**, **A386-388**, **A396-397**.

All of these rules and regulations show significant hands-on control by the DOD/Army over hiring, performance, evaluations and termination of contractors, such as Griffin, which illustrates that the Army is a joint employer.  At minimum, the Army had joint control.  Also, even if SM Millman is correct that the method of termination weighs in favor of Fluor as being an employer, that is only one factor among so many.

### D.  Whether Work is Part of Regular Business of Hiring Party

Another issue to be analyzed, pursuant to *Nationwide,* is whether the work is part of the regular business. SM Millman analyzed whether Petitioner's work was a "part of [the Army's] regular business or "integral" business.  **A027**.  The Court <u>conceded</u> that Griffin's job was necessary to the business of the military; but then, stated that Petitioner's argument misconstrues the purpose of this factor in an agency analysis. SM Millman then went to the Internet, again, in an attempt to substantiate the conclusion/legal error made in this regard. SM Millman "argued" that the stated mission of DOD is to "provide the military forces needed to deter war and to protect the security of our country."  **A027**.  She then concluded that Griffin provided "support services", which though necessary, were secondary to the core mission of the military.

However, the evidence provided by the Petitioner, if regarded as true, shows the DOD has a different view. Under Phase III: Sustainment, operations are <u>now a</u> **<u>core DOD mission</u>** <u>elevated to the **same priority** as combat missions</u> and sustainment operations. **A340**, **A306-307**. The conclusion by SM Millman also ignores the evidence provided by the Commentaries presented illustrating that these positions, such as Griffin's, were traditionally reserved for government employees, **A244-A247** and that overall, more than 2,000 of contractor personnel have been killed in Iraq and Afghanistan. **A254**. This undisputed evidence contradicts the undisclosed research conducted by SM Millman. The special master failed to view the evidence "presented on the motion" in the light most favorable and to draw all justifiable inferences in Griffin's favor. Such was legal error. The work conducted by Griffin, as presented by the undisputed evidence, was definitely "part of the work of the Army's regular business." Indeed, it was "core" and elevated to the same priority as combat missions!

### E.  Method of Payment, Employee Benefits, Tax Treatment

Other issues to be analyzed include method of payment, employee benefits and tax treatment. SM Millman analyzed all three of these issues. **A028**. Petitioner concedes that it was Fluor who cut his check and provided him with benefits. However, as prior decisions have indicated, such as in *Harris v. Atty. Gen.*, 657 F. Supp.2d 1 (D.D.C. 2009), factors such as contract, ultimate authority

50

to terminate, accrued vacation time, withholding of Social Security taxes, salary and benefits, should not, on balance, outweigh the evidence of the control outlined in the undisputed evidence provided by Griffin.  Pursuant to *Harris*, these factors are largely "payroll matters and formalization of hiring and termination."  *Harris, supra*, at 10-11.  These formalities were largely "controlled" by the Army, while they had Fluor ultimately follow through with these formalities.  At minimum, this is a joint employer relationship.

### F.  Duration of Relationship Between the Parties, Right to Assign Additional Projects, Discretion Over When and How Long to Work

Pursuant to *Nationwide*, three other issues are relevant to the agency question: duration of the relationship between the parties, whether the hiring party has the right to assign additional projects to the hired party; and, the extent the hired party has discretion over when and how long to work.  *Nationwide, supra,* at 322-323.  Pursuant to the evidence, Griffin had been in Afghanistan for approximately 3 1/2 years when he had received his influenza vaccine for the first time because it had become a new DOD medical requirement in order to be "fit for duty."  **A040**.  Also, as analyzed in detail above, it was the Army who met with him on a daily basis to go over projects, status of projects etc. And, because he was on the military base subject to the Army's command, although not directly addressed, it would not be a giant leap to assume that it was the Army that had discretion over when and how long Griffin worked.  After all, they controlled

everything.  In fact, it is highly doubtful that Griffin sauntered into his daily

meetings, when he decided, when he was meeting with high-ranking military

officials to go over the daily needs and issues.  "The control over my daily work

activities was by the military.  They were the ones calling the shots.  These

meetings were conducted by and between various commanding officers and

myself….".  **A269 ¶ 7**.

### G.  Conclusion in Regard to Agency Test

Setting aside several concessions, SM Millman found that the "objective

evidence" manifest the parties' clear intent that Fluor be treated as an independent

contractor and that Fluor's employees not be treated as federal employees.  **A028-**

**A029**.  She looked at the contract which stated that Fluor will operate as an

independent contractor and not as an agent of the US government or US Army.

But, as the United States District Court, in *Harris*, analyzed "defendant's heavy

reliance on the language of the contract to show that plaintiff was not an

"employee" does little to advance the inquiry regarding the "analysis of the

'economic realities" of the work relationship."  <u>All contracts manifest the parties'</u>

<u>intent, they do not necessarily reflect "economic realities.</u>"  *Harris, supra* at 10.

[Also see *Andrews, supra*, *5 (nothing in the "employment provision" of the

Vaccine Act indicates that an employment contract with the United States as a

signatory or payor plays an especially significant role.)  And *King v. Dalton, supra.*]

Millman relied heavily on factors that did not reflect the economic realities in contradiction to the law, while repeatedly minimizing the undisputed evidence or coming up with her own research or facts without any notification to the Petitioner.  The special master repeatedly failed to provide the requisite favorable treatment to the evidence presented including that all justifiable inferences are to be drawn in his favor.  Repeated legal error was committed.  Moreover, the mandate by the United States Supreme Court that the function of a court in statutory interpretation is "to construe the language so as to give effect to the intent of Congress" (*United States v. American Trucking, supra*) was not, in Petitioner's opinion, applied.

## X.    WAS GRIFFIN A MEMBER OF THE ARMED FORCES

Millman determined that Griffin was not "a member of the armed forces." **A020**.  In so doing, she provided case law and definitions that were not provided by either Respondent or Petitioner. SM Millman stated that no source that the undersigned found has identified civilians such as Petitioner to be "members of the armed forces." **A020**.  In Griffin's case, it is not enough to just go to the Internet and look up definitions without actually looking up or asking for definitions that are specifically applicable to Griffin, as he was a CAAF.  **A306**.  Doing so, without

providing notice and the benefit to respond was legal error and deprived Griffin of due process.  As previously outlined, Petitioner was never asked; but, he responded within the Motion for Review and its attachments.

Similar to members of the Armed Forces, Griffin was required to have a Common Access Card (CAC) and Letter of Authorization (LOA), which gave him prisoner of war (POW) status, among other things.[9]  The Special Master <u>conceded</u> that while Petitioner complied with certain requirements imposed by the Army, such as medical clearances, she erroneously determined that Griffin did not undergo basic training or <u>any of the other steps</u> that are indicia of being a member of the Armed Forces.  **A020**.  (Emphasis added.)  Point in fact, SM Millman had no personal knowledge what Griffin underwent in terms of training or other steps.  This conclusion is without any evidence.  While the Special Master took substantial time and energy to look up websites in support of her decision to deny Petitioner's eligibility, she appeared to disregard other highly relevant websites in support of his eligibility such as the Defense Contingency Contracting Handbook, which states, in relevant part:

---

[9] See Department Of Defense Instruction, No. 3020.41, December 20, 2011 ("DoDI 3020.41"). (**A297 § PROCEDURES** ¶ a. Status of Contractor Personnel/ENCLOSURE 2).  Also see **A314** ¶ b. Country Entry Requirements/**Attachment 2, p. 9, 14**).  <u>*And See*</u> Army Regulations 715-9 Procurement Operational Contract Support Planning and Management  (**A352-A353 § 3-2** Predeployment considerations, ¶ e. Geneva Convention category identification and ¶ f. Common access card issuance)

> All CAAF personnel shall report to the deployment center designated in the contract before departing for a contingency operation to complete the following Gen. deployment procedures: …Validate or complete <u>required training</u> on topics such as the Geneva Convention; law of armed conflict; Gen. orders; standards of conduct; force protection; personnel recovery; medical issues; operational security; anti-terrorism efforts; nuclear, biological, and chemical protective gear; country briefing and cultural awareness; combating trafficking in persons; and other appropriate subjects." **A336-337**.

The military are likewise trained on these very same subjects.

Griffin, in addition to being provided his CAC, LOA and identification tags, which are identical to the Armed Forces, he was also given military protective equipment. **A353, § 3-2 ¶¶ i and 1**. Thus, SM Millman's conclusion that no indication of being a member of Armed Forces exist is incorrect.

Millman also made the assumption that even though the government required that Petitioner pass various clearances, Fluor was the responsible party for ensuring that these criteria were met. She further stated the contract provided that Fluor was responsible for ensuring that employees were medically and physically fit and stated that immunizations and pre-deployment medical screenings were to be provided at Fluor's expense. **A026.** It also provided that Fluor was responsible for providing another qualified employee if the government determined that a contractor employee did not meet the requisite health or security requirements. **A026**. SM SM Millman further stated that it was Fluor, not the Army, who notified petitioner when he passed his security clearance. **A026**. Here too, the

55

Special Master failed to recognize that Griffin's pre-deployment procedures were "required" by the Army and were done at a designated place recognized as equal to a military reception center.[10] **A316 § e**.

A serious problem is that SM Millman went beyond the evidence provided by Petitioner, did not provide him with the favorable assumptions required by summary judgment law, did not give notice to him that she was going to go beyond the evidence and provide her own evidence and did not allow him to address her new facts, based upon what appears to him to be inapplicable definitions and assumptions, as opposed to analyzing rules and regulations applicable to him as a CAAF.  The evidence provided along with rules of statutory construction indicate that Griffin was a member of the Armed Forces for purposes of this Vaccine Act and that SM Millman committed legal error in construing that Griffin was not a "member of the Armed Forces."

Millman also determined that Petitioner **did not return** to the United States within six months of his vaccination, relying on a Federal Court of Claims decision, *McGowan*, stating that this decision stands for the premise that both the physical presence and a subjective intent to remain in the United States are required to meet the Vaccine Act's "return" requirement.  **A019-A020**.  Just as SM

---

[10] Department Of Defense Instruction, No. 3020.41, December 20, 2011 ENCL. 2 <u>Deployment Center Procedures</u>

Millman made it clear that former special master Abell's decision, in *Andrews*, is not binding on her, (**A023**) *McGowan*, likewise, is not precedent for this case. Griffin outlined in his first declaration (**A074 - A077**) how he was a United States citizen, never intended on giving up his citizenship, had daily contact with his family members, paid federal income tax, contributed to social security and worked in support of our United States Army. He further stated that never, in an instant, did he think he was giving up benefits of being a United States citizen when he agreed to work side-by-side with the United States Armed Forces in Afghanistan. **A074-A077 ¶¶ 1-6 and 9**. Consequently, *albeit* subjectively, he never left the United States and was always subject to the laws of the United States. Therefore, he queries whether he ever left such that he had to "return within six months." The rationale outlined by the CFC decision, in *McGowan*, does not apply to the facts of this case. In *McGowan*, the petitioner was a child who received a vaccination in Canada, where she resided for 2 years. She traveled to the United States several times within 6 months of her vaccination to visit her grandparents for 3 to 4 days at a time. She was not truly domiciled in the United States. The CFC explained that to define "return" just by visiting the United States within 6 months of vaccination would allow expatriate Americans, or any non-citizen who has visited the United States, merely to return and spend the day in the United States eligibility to petition and take advantage of the compensation

program's ease and funding.  Such would defy logic, especially where the potential of affording compensation to visitors of the United States is present.  *McGowan,* 31 Fed. Cl. At 739-40.  Griffin, in this case, agrees that under such scenario, one should not be eligible as they are not truly domiciled in the United States.  His situation is quite different as the facts and evidence clearly indicate.  He was always a United States citizen, has never given it up, paid taxes, is subject to the jurisdiction of the United States and work side by side with our United States Armed Forces.

Judge Bruggink did not address these last two issues.  Instead, he  relied heavily on his decision that Title V applied and that was the end of the discussion.

## XI.    CONCLUSION AND RELIEF SOUGHT

If SM Millman's and Judge Bruggink's decisions are upheld, a class of petitioners will be excluded from this Vaccine Program solely because they did not come back within 6 months despite the fact that they are United States citizens, pay their federal taxes, worked side-by-side with our armed forces.  It also means this class' remedy is to litigate against the manufacturers.  This is not what Congress intended.  When one looks at (1) these cases that determine that a subcontractor can, in fact, have two employers and that the contract terms are not as important as the control exerted and the economic realities along with (2) Congressional intent and legislative intent for the Vaccine Program as well as (3) the evidence of this

case, which clearly indicates that the United States Army/DOD had substantial control over Griffin, the facts should clearly tilt the scales of justice in favor of Griffin.  The facts, the law and the Congressional intent all support that Griffin should be found to be an eligible Petitioner as either an employee of the United States, a member of the Armed Forces or due to the fact that he never subjectively left the United States.  Under *de novo* review, Griffin requests that this Court set aside the Decisions and enter a decision in his favor finding that, at minimum, he is an Employee of the United States.

Respectfully submitted,

December 17, 2015

/s/ Lisa A. Roquemore
Lisa A. Roquemore
Counsel of Record for the Petitioner- Appellant
Law Office of Lisa A. Roquemore
192001 Von Karman Ave. Suite 500
Irvine, Ca. 92612
(949) 622-5572
*Counsel for Petitioner-Appellant*
*DAVID D. GRIFFIN*

# ADDENDUM

# In the United States Court of Federal Claims

No. 13-280V
(Filed: August 26, 2014)

* * * * * * * * * * * * * * * * * * * * * *

DAVID D. GRIFFIN,

                *Petitioner*,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

            *Respondent.*

National Childhood
Vaccine Injury Act;
Eligibility; Employee of
the United States.

* * * * * * * * * * * * * * * * * * * * * *

    *Lisa A. Roquemore*, Irvine, CA, for plaintiff.

    *Lara A. Englund*, United States Department of Justice, with whom were *Catherine E. Reeves*, Assistant Director, *Vincent J. Matanoski*, Deputy Director, *Rupa Bhattacharyya*, Director, and *Stuart F. Delery*, Assistant Attorney General, Washington, DC, for defendant.

## OPINION[1]

    Currently before the court is petitioner's motion for review of the Special Master's April 4, 2014 decision dismissing plaintiff's petition for compensation for an injury allegedly caused by a vaccine. The matter is fully briefed and ready for decision. Oral argument is unnecessary. For the reasons explained below, we deny petitioner's motion for review.

    On April 23, 2013, petitioner, David Griffin, filed a petition for compensation under the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-1 to-34 (2012) ("Vaccine Act"). The petition alleges that Mr. Griffin

---

[1] This opinion will be held for fourteen days during which the parties are directed to consult and indicate to chambers any appropriate redactions. Rules of the Court of Federal Claims ("RCFC") App. B, Rule 18(b).

developed Guillain-Barré Syndrome ("GBS") after receiving an influenza vaccine on February 1, 2012, while working in Afghanistan as a contractor for the Department of Defense ("DOD"). Respondent filed a motion for summary judgment on July 2, 2013, arguing that, because petitioner received his vaccination outside the United States, he was not eligible for compensation under the Vaccine Act because he was neither a member of the Armed Forces nor an employee of the United States at the time of his vaccination, and he did not return to the United States within six months of receiving the vaccine. The Special Master agreed that petitioner was not eligible for compensation under the Act and dismissed the petition. *See Griffin v. Sec'y of Health & Human Servs.*, No. 13-280V, 2014 WL 1653427 (Fed. Cl. Spec. Mstr. April 4, 2014).

## BACKGROUND[2]

I.      Facts

Petitioner, David Griffin, a United States citizen,   arrived in Afghanistan on January 31, 2012, to begin his position as a site manager for Fluor, an engineering construction company that contracted to provide support services to DOD and other government agencies. The contract specified that Fluor was not an agent of the government but rather was an independent contractor. Fluor was responsible for all aspects relating to its employees. This included making sure each Fluor employee passed medical and security clearances required by the DOD, obtaining passports and visas for employees, and training employees and ensuring that they receive government training for interactions with detainees. The Government retained the right to remove Fluor employees from the site, but only Fluor had the authority to terminate its employees. Contract personnel were prohibited from wearing military clothing unless authorized to do so. Even those contractors who were authorized to wear military uniforms were ordered to wear distinctive patches or badges so as not to be confused with members of the Armed Forces. Fluor contractors also agreed to identify themselves as such when corresponding with others to avoid creating the impression that they were government employees or members of the military.

As site manager, petitioner was required to possess knowledge of various managerial aspects of the base, including budgeting, supervising,

---

[2] The facts are derived from the Special Master's decision and are not in dispute.

2

communication, the military's network, the ordering of supplies, and issues concerning sanitary, plumbing, electrical and cooking needs. He attended daily and weekly meetings with military officials and kept in contact with his off-site Fluor supervisor through a weekly telephone conference. Many of petitioner's decisions were influenced by army regulations, and he received performance reviews from the military. All of Mr. Griffin's equipment was provided by the military.

Fluor paid Mr. Griffin directly, withheld federal income taxes from his paycheck, and also provided him with health and dental care. Fluor also ensured that its employees were covered by the Defense Base Act, which provides workers' compensation to civilian employees working on U.S. military bases.

Pursuant to the contract between Fluor and DOD, Mr. Griffin passed various medical and security clearances and was declared "fit for duty" in July of 2010. On February 1, 2012, the day after he arrived in Afghanistan, petitioner received an influenza vaccine at a Fluor Clinic at Bagram Airfield in accordance with DOD's requirements. In mid-February 2012, Mr. Griffin began to experience weakness and numbness in his extremities. He checked in to Makati Medical Center in the Philippines on March 9, and on March 12, Dr. Cynthia B. Anacay noted that petitioner's symptoms were indicative of GBS.

Mr. Griffin filed a petition under the Vaccine Act on April 23, 2013. Respondent filed a motion for summary judgment on August 9, 2013, arguing that the Vaccine Act is unambiguous in limiting compensation to employees of the United States and that the word "employee" should be considered in its ordinary meaning. An employee, respondent argued, is "one who works directly for an employer and receives compensation and other benefits directly from the employer in return." Under this definition, respondent concluded that Mr. Griffin was not an employee of the United States and, thus, was not eligible for compensation under the Vaccine Act.

II. The Special Master's Analysis

In order to receive compensation for an injury caused by a vaccine under the Vaccine Act, a petitioner must have

> (I) received the vaccine in the United States or in its trust territories, (II) received the vaccine outside of the United States

3

**A03**

or a trust territory and at the time of the vaccination such person was a citizen of the United States serving abroad as a member of the Armed Forces or otherwise as an employee of the United States or a dependent of such a citizen, or (III) received the vaccine outside the United States or a trust territory and the vaccine was manufactured by a vaccine manufacturer in the United States and such person returned to the United States not later than 6 months after the date of the vaccination.

42 U.S.C. § 300aa-11(c)(1)(B). Petitioner does not claim that he received the vaccine in the United States or in one of its trust territories, and thus the Special Master focused on subsections (II) and (III) in her analysis. She eliminated subsection (III) based on evidence that petitioner did not return to the United States within six months of receiving the flu vaccine. The Special Master also concluded that petitioner was not a member of the Armed Forces, defined in 10 U.S.C. § 101(4) (2012), as being a member of the "Army, Navy, Air Force, Marine Corps. and Coast Guard." This left only the possibility that petitioner could qualify for compensation as an "employee of the United States."

In determining whether Mr. Griffin was an employee of the United States, the Special Master looked to other statutory schemes and analyzed a hybrid of the common law agency factors applied by the Supreme Court in the ERISA[3] context in *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318 (1992) (overturning the circuit court's affirmance of summary judgment because the lower courts failed to apply the common law master/servent agency test), and the factors considered by the D.C. Circuit in *Spirides v. Reinhardt*, 613 F.2d 826 (D.C. Cir. 1979), to determine whether petitioner was a federal employee.[4] She focused on the overarching question of whether Fluor

---

[3] "ERISA" refers to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 (2012).

[4] *Spirides* involved a sex discrimination complaint brought under Title VII of the Civil Rights Act of 1964. The District Court for the District of Columbia dismissed plaintiff's complaint for lack of subject matter jurisdiction on the ground that plaintiff was an independent contractor and not an employee under the Act. The District Court based its decision primarily on the terms of plaintiff's string of successive one-year employment contracts. *Spirides*, 613

(continued...)

4

or the Military had the right to control the means and manner of Mr. Griffin's performance by analyzing and balancing factors from both the common law agency test and the *Spirides* test. The Special Master noted that certain factors weighed in favor of the petitioner: the military provided petitioner with a place to work and tools with which to do his work; members of the military regularly met with petitioner; and DOD required petitioner to pass various medical and security clearances in order to work on base.

The Special Master ultimately decided, however, that more factors weighed against petitioner's claim that he was a federal employee: Fluor paid petitioner, it provided him with medical and dental benefits, it withheld federal income taxes from his paycheck, and it had the authority to terminate him. The Special Master observed that the terms of the contract stated specifically that petitioner was an independent contractor and not an employee of the United States. She also noted that petitioner possessed specialized knowledge and specific skills ,indicating that he did not fall into the traditional master/servant category of an employee; that petitioner provided support services to the military rather than participating in any core functions of the organization; and that petitioner's listing of Fluor as his employer on worker's compensation forms indicated that he believed Fluor to be his employer.

While recognizing that no one factor under either the common law or the *Spirides* tests was determinative, the Special Master concluded that the factors collectively weighed heavily against treating petitioner as an employee of the United States. She consequently determined that Mr. Griffin is ineligible to receive compensation under the Vaccine Act, granted respondent's motion for summary judgment, and dismissed the petition.

---

(...continued)
F.2d at 832. The D.C. Circuit Court overturned the district court's dismissal and remanded for further factual inquiring, holding that, although an employer's right to control an employee's "means and manner" of performance is the most important factor to consider in determining whether or not an individual is an employee, economic realities must also be taken into consideration in making that determination. *Id*. at 831-32. This can be achieved through "the application of general principles of the law of agency to undisputed or established facts. Consideration of all of the circumstances surrounding the work relationship is essential, and no one factor is determinative." *Id*. at 831.

**DISCUSSION**

This court has jurisdiction to review decisions of the special masters in accordance with 42 U.S.C. § 300aa-12. We review the special master's decision under the standard articulated in 42 U.S.C. § 300aa-12(e), and we only set aside decisions in which "findings of fact or conclusion of law" are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.* § 300aa-12(e)(2); *see Carson v. Sec'y of Health & Human Servs.*, 727 F.3d 1365, 1368 (Fed. Cir. 2013) (the reviewing court should "give no deference to the . . . Special Master's determinations of law, but uphold the Special Master's findings of fact unless they are arbitrary or capricious"). Special masters have discretion to weigh the evidence and "reversible error is 'extremely difficult to demonstrate'" unless the special master has failed to consider the relevant evidence of record, drawn implausible inferences or failed to articulate a rational basis for the decision. *Lampe v. Sec'y of Health & Human Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000) (quoting *Hines v. Sec'y Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1999)). The reviewing court does "not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses–these are all matters within the purview of the fact finder." *Porter v. Sec'y of Health & Human Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011).

III. Petitioner Was Not An Employee of the United States

Petitioner challenges the Special Master's decision on three grounds. The first is that the Special Master's application of the common law agency test and the *Spirides* factors was legally and factually in error. Had the Special Master properly considered the evidence, she would have come to a different conclusion, according to petitioner. The second challenge, much like the first, is that the Special Master improperly applied the standard for summary judgment by not drawing reasonable inferences in his, the nonmovant's, favor. In petitioner's view, his exhibits and declaration testimony establish that the military was in charge of his time in Afghanistan, and thus the Special Master should have inferred that he was an employee of the United States when he received the vaccine. The third challenge raised by petitioner concerns legal and factual research conducted by the Special Master, which petitioner alleges was improper.

Respondent agrees with the Special Master's ultimate conclusion but also argues that her consideration of the common law agency test and the

6

*Spirides* factors was unnecessary. Those were intended to regulate employment relationships, not to interpret bright line rules in statutory language, per respondent. Respondent urges that the Vaccine Act uses "employees of the United States" as a term of art and that government employees are governed by a unique set of statutes, which define their relationship with the government. As such, considerations of common law factors and the meaning of "employee" under other statutory schemes is inappropriate, according to respondent.

We agree with respondent. Title V of the United States Code defines a federal employee as someone who is

> (1) appointed in the civil service by one of the following acting in an official capacity
>> (A) the President;
>> (B) a Member or Members of Congress, or the Congress;
>> (C) a member of a uniformed service;
>> (D) an individual who is an employee under this section;
>> (E) the Head of a Government controlled corporation; or
>> (F) an adjutant general designated by the Secretary concerned under section 709(c) of title 32;
> (2) engaged in the performance of a Federal function under authority of law or an Executive act; and
> (3) subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position.

5 U.S.C. § 2105(a) (2012). Federal government employees are governed by Title V of the United States Code. As the courts have explained in a variety of contexts, federal workers' rights are defined by Title V and not by contract, the common law, or other statutes not specifically made applicable to federal workers. *See, e.g.*, *Doe v. United Sates*, 513 F.3d 1348, 1359 (Fed. Cir. 2008) ("federal employee benefits and pay are governed by statute, not by contract"); *Billings v. United States*, 322 F.3d 1328, 1333 (Fed. Cir. 2003) (stating that the Fair Labor Standards Act did not apply to federal employees until it was amended to make it specifically applicable to them); *New v. Dep't of Veterans Affairs*, 142 F.3d 1259, 1261 (Fed. Cir. 1998) (unemployment compensation

for federal employees is governed by the Federal Employees Compensation Act, codified in Title V). *Cf. Harris v. United States*, 13 Cl. Ct. 363, 365 (1987) ("Overtime compensation due a federal employee is governed by statute and not be 'just and equitable' considerations."). Thus, when a statute limits its applicability, at least in part, to only United States employees, we presume that Congress had in mind the definition of a federal employee from the statutes that govern them.

Petitioner has not alleged that he is a civil service employee nor that he was appointed by any of the above listed officials. Petitioner's right to compensation under the act begins and ends there. While the Special Master interpreted the Vaccine Act more liberally and looked outside of the realm of federal employment law to the common law and the remedial ERISA statute context, even this generous grant of consideration lead to the conclusion that Mr. Griffin was not an employee of the United States.

Congress enacted the Vaccine Act to make it simpler for those negatively affected by vaccinations in the United States to receive compensation. One clear limit upon the scope of the act, however, is its definition of who is eligible to receive compensation. Only those present in the United States, or who return there within six months of receiving the vaccine, or those serving abroad as a member of the military or in civil service are covered. *See* 42 U.S.C. § 300aa-11(c)(1)(B). When reading this provision of the Vaccine Act, the canon *expressio unius est exclusio alterius*, meaning to include one thing implies the exclusion of the other, is applicable. This canon "has force . . . when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). Even if everything petitioner avers is true, and we draw all inferences in his favor, such as his *de facto* control by military officials, he was not a member of the United States Civil Service as defined section 2105 of the Title 5 when he received the influenza vaccine in Afghanistan.

Further, even if we examined the Special Master's application of the common law agency test and the factors applied by the *Spirides* court, we would conclude that it was not arbitrary and capricious. The Special Master considered all of the evidence presented, including the control of petitioner's day-to-day duties by the military, and concluded that ultimate control lay with Fluor, with whom he had an employment contract, from whom he received pay, and who had the power to terminate him. To the extent that the Special

Master made any legal error, it was in petitioner's favor, and is thus harmless.

IV. The Special Master Did Not Abuse Her Discretion By Conducting Legal Research and Taking Limited Judicial Notice

Petitioner's third argument is that the Special Master improperly consulted materials outside the pleadings in making her determination of petitioner's ineligibility. Specifically, he argues that the Special Master's consultation of the Restatement (Second) of Agency, case law, dictionaries, and several websites, without providing him notice, amounted to legal error. Respondent disagrees, arguing that the Special Master did not err by conducting outside research without giving petitioner notice because the matters she researched were all appropriate issues for taking of judicial notice. Respondent cites the Federal Circuit's opinion in *Hines* as allowing for the taking of judicial notice in vaccination cases.[5] *Hines*, 940 F.2d at 1525-26.

Special Master Millman did not err by consulting the Restatement and case law when reviewing Mr. Griffin's petition. It is not error for a judicial officer to research prior decisions that might bear on the case in front of her. Our legal system rests largely on the principle of *stare decisis*. "'*Stare decisis* in essence makes each judgment a statement of the law, or precedent, binding in future cases before the same court or another court owing obedience in its decision.'" *Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299, 1309 (Fed. Cir. 2008) (quoting *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1570 (Fed. Cir. 1993)). The Special Master's use of decisional law to support her determination was not only without fault, it was necessary. As to dictionaries and encyclopedias, both are within the bounds of judicial notice as they contain commonly known information which need not be proved. *B.V.D. Licensing Corp. v. Body Action Design*, 846 F.2d 727, 728 (Fed. Cir. 1988).

---

[5] In *Hines*, the Special Master consulted a medical textbook in making his decision on a Vaccine Act petition. The petitioner there claimed that the Special Master erred by doing so because he did not allow petitioner a chance to respond to the evidence from the textbook. The Federal Circuit held that evidentiary principles of "fundamental fairness" were not violated in this instance of judicial notice because petitioner had the opportunity to respond and discredit information in the medical textbook on review by the Court of Federal Claims. The Federal Circuit also concluded that, even if the Special Master's taking of judicial notice was in error, the error was harmless as it was not critical to the resulting decision. *Hines*, 940 F.2d at 1525-26.

9

Special Master Millman also cited three websites not presented by the parties in her decision. Two of the websites she consulted were government websites: the Department of Labor website and the Department of Defense website. She consulted these for generally available information regarding insurance coverage under the Defense Base Act and the stated mission of the Department of Defense. The other website was an informal military website, which she used to expand the definition of Armed Forces to include members of the Reserves and the National Guard. "The Federal Rules of Evidence specifically permit the taking of judicial notice of a fact which is 'not subject to reasonable dispute' because it is 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Id*. at 1526. In his Motion for Review, Mr. Griffin made no attempt to discredit the Special Master's research as to its substance or to prove that the introduction of the research violated "fundamental fairness" principles. In short, he has not alleged any prejudice. Morever, we see no evidence that any of the information garnered from these websites was relied upon or crucial to the Special Master's holding, and we have no doubt that her conclusion would have been the same without the information therein provided. If the Special Master committed error by conducting outside research, it was innocuous.

## CONCLUSION

Because petitioner was not an employee of the United States when he received his vaccine abroad, he is not eligible for compensation under the Vaccine Act. The Special Master's decision granting summary judgment to defendant was therefore not arbitrary or capricious. Accordingly, the clerk is directed to dismiss the complaint and enter judgment for defendant.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge

10

# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
No. 13-280V
Filed: April 4, 2014
For Publication

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| DAVID D. GRIFFIN, | * | |
| | * | |
| Petitioner, | * | Dismissal decision; motion for summary |
| | * | judgment; flu vaccine; GBS; federal |
| v. | * | government contractor; not a federal |
| | * | employee |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Lisa A. Roquemore, Irvine, CA, for petitioner.
Lara A. Englund, Washington, DC, for respondent.

**MILLMAN, Special Master**

## DECISION[1]

On April 23, 2013, petitioner filed a petition for compensation under the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act" or "Act"), 42 U.S.C. §§ 300aa-10–34 (2006), alleging that he suffered Guillain-Barré Syndrome ("GBS") caused by his February 1, 2012, receipt of flu vaccine. Petitioner received the flu vaccine while in Afghanistan employed as a federal government contract worker.

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, the special master intends to post this decision on the United States Court of Federal Claims's website, in accordance with the E-Government Act of 2002 § 205, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 (2006)). Vaccine Rule 18(b) states that all decisions of the special masters will be made available to the public unless they contain trade secrets or commercial or financial information that is privileged and confidential, or medical or similar information whose disclosure would constitute a clearly unwarranted invasion of privacy. When such a decision is filed, petitioner has 14 days to identify and move to redact such information prior to the document's disclosure. If the special master, upon review, agrees that the identified material fits within the banned categories listed above, the special master shall redact such material from public access.

On July 2, 2013, respondent filed a motion for summary judgment, arguing that petitioner is not entitled to compensation under the Vaccine Act because he was not "serving abroad . . . as an employee of the United States" when he received the flu vaccine. The motion has now been fully briefed and is ripe for decision.

In this case, petitioner does not qualify for compensation under section 300aa-11(c) of the Vaccine Act. Based on the statutory language, legislative history, and purpose of the Vaccine Act, it is clear that Congress intended to compensate only a certain class of persons who suffer a vaccine injury after receiving a vaccine overseas. Congress provides protection to members of the Armed Forces, federal employees, and individuals who return to the United States within six months of their vaccination. Petitioner did not return to the United States within six months of his vaccination. Nor is petitioner a member of the Armed Forces. Finally, under a traditional agency analysis, petitioner cannot be considered an employee of the United States government. Under the principles of sovereign immunity, the undersigned may not expand on the waiver of immunity stated in the statute. Petitioner does not fall within any of the categories listed in § 300aa-11(c)(1)(B)(i)(II) or (III) and is thus not eligible to bring a petition in the Vaccine Program.

## I.  Factual History

Petitioner David Griffin is a United States citizen who worked for Fluor in the Fluor Federal Global Project. He describes himself as a "civilian government employee." Griffin Decl. ¶ 5, Aug. 26, 2013. Fluor maintains a sizeable government contract with the Department of Defense ("DOD"), and many of its employees work alongside United States Armed Forces personnel in Afghanistan. Id. Fluor provides support services to DOD and other government agencies through the U.S. Army Logistics Civil Augmentation Program. Ex. 10, at 1, 2. These services include food services, latrines, waste management, facilities and construction management, morale, and recreation, among others. Ex. 11, at 16. Petitioner asserts that the salary and hiring criteria for a person in his position were set by the military. Griffin Decl. ¶ 8, Dec. 18, 2013.

The 80-page contract between HQ Army Sustainment Command and Fluor includes various provisions regarding their relationship. See Ex. 11. The contract states that "the awardee [Fluor] will operate as an independent contractor and not as an agent of the U.S. Government or U.S. Army." Ex. 11, at 3. It requires Fluor to ensure that all "deployable employees are medically and physically fit." Id. at 30. Fluor is responsible for obtaining its employees' passports and visas. Id. at 31. Fluor also trains its employees, with the exception that the government will train contractor personnel on interacting with detainees, and Fluor is responsible for ensuring that certain employees receive this training. Id. at 34; Id. at 56–57. The contract allows the government to direct Fluor to "remove" any contractor personnel who "jeopardize or interfere with mission accomplishment or who fail to comply with or violate" the contract. Id. at 75. The contract specifies that "[c]ontractor personnel are prohibited from wearing military clothing unless specifically authorized," and even then, contract personnel must "[w]ear distinctive patches, arm bands, nametags, or headgear, in order to be distinguishable from military personnel." Id. It also states:

> All contractor personnel attending meetings, answering Government telephones, corresponding by email and working in other situations where their contractor status is not obvious to third parties are required to identify themselves as such to avoid creating an impression that contracted personnel are Government employees, or official representatives of a Governmental organization.

Id. at 19.

Petitioner was hired by Fluor as a site manager located in Asia/Afghanistan.  Ex. 1, at 10; Ex. 4, at 10; Suppl. Resp. at 8.  Pursuant to the contract between Fluor and DOD, petitioner underwent required medical and security clearances.  Ex. 11, at 5, 30.  In July 2010, he was acknowledged as "fit for duty" in accordance with USCENTCOM policies by Occucare International in Dubai.  Ex. 2, at 1.  Petitioner's security clearance was obtained through CENTCOM Service Component.  Ex. 14, at 8.  Petitioner received emails from the Army regarding his security investigation and was notified by Fluor Industrial Security when he passed his security clearance.  Ex. 19, at 1–2.

On January 31, 2012, petitioner arrived in Afghanistan.  Pet. at 2.  On February 1, 2012, petitioner received influenza vaccine, and his second vaccinations of MMR and varicella.  Med. recs. Ex. 5, at 1–3.  The flu vaccine was a requirement by DOD and was distributed at a Fluor clinic at Bagram Airfield, a United States military base.  Ex. 15, at 8; Ex. 5, at 3.  The immunizations were provided at Fluor's expense.  Ex. 15, at 4.

As a site manager, petitioner worked on a military base in Afghanistan.  Griffin Decl. ¶ 13, Dec. 18, 2013.  He describes his job as akin to a project manager.  Id. at ¶ 12.  He managed "all departments" on the base, which required knowledge about "budgeting, the military's network, supervising, ordering of supplies, communicating, as well as . . . basic knowledge regarding laundry, showers, latrines . . . plumbing, electrical, and cooking."  Id.  Petitioner had daily contact with military officials, including weekly meetings with military commanding officers and the mayor of the base.  Suppl. Resp. at 6.  Petitioner and military officials discussed deadlines, materials, and issues with projects at these daily meetings.  Griffin Decl. ¶ 7, Dec. 18, 2013.  Petitioner also had weekly telephonic conferences with his off-site Fluor supervisor, Cheryl Robertson, in which other site managers were included.  Id. at ¶ 8.  Petitioner's management decisions as site manager were influenced by Army regulations.  Id. at ¶ 12.  Petitioner used equipment and materials that were provided by the military and was required to have military authorization for all requisitions.  Id. at ¶ 9.  The military reviewed petitioner's work performance.  Id.

Petitioner was paid an hourly rate by Fluor.  Ex. 8, at 2–3; Ex. 9, at 1–2.  Federal income taxes were taken from his Fluor paycheck.  Ex. 9, at 1–3.  His health and dental care were provided through Fluor.  Id.; Ex. 20, at 1.  The ultimate authority to terminate petitioner's employment remained with Fluor.  Suppl. Resp. at 8.  Petitioner also accrued leave through Fluor.  Id.

In mid-February 2012, petitioner began to experience weakness and numbness in his extremities.  Med. recs. Ex. 3, at 4.  On March 5, 2012, petitioner's workers' compensation

report was filed with the U.S. Department of Labor. Ex. 20, at 1. The Defense Base Act provides workers' compensation protection to civilian employees working outside the United States on U.S. military bases or under contract with the U.S. government for public works or for national defense. 42 U.S.C. §§ 1651–55 (2006). A private insurance carrier, not the federal government, pays for successful workers' compensation claims under the Defense Base Act. Division of Longshore and Harbor Workers' Compensation (DLHWC), United States Department of Labor, http://www.dol.gov/owcp/dlhwc/ DBAClaimAdministration.htm (last visited Mar. 26, 2014). The contractor, not the government, is responsible for ensuring the contractor's employees have Defense Base Act coverage. Id. Petitioner lists Fluor as his employer in three different places in his workers' compensation papers. Ex. 20, at 1, 3, 5.

On March 9, 2012, petitioner visited Makati Medical Center emergency department in Manila, Philippines. Med. recs. Ex. 3, at 4. He complained of weakness and numbness in his extremities for the previous 17 days (beginning February 21, 2012). Id. On March 12, 2012, Dr. Cynthia B. Anacay noted that petitioner's symptoms were supportive of Guillain-Barré syndrome. Id. at 7.

## II.    Procedural History

On April 23, 2013, petitioner filed a petition under the Act. On August 9, 2013, respondent filed a motion for summary judgment, arguing that petitioner is not entitled to compensation under the Vaccine Act because he was not "serving abroad . . . as an employee of the United States" when he received the flu vaccine. Mot. Summ. J. at 1. Respondent argues that the Vaccine Act is unambiguous and should be interpreted according to the ordinary usage of "employee," which means one who "works directly for an employer and receives compensation and other benefits directly from the employer in return." Id. at 4. (Respondent does not cite a source for this definition.) Respondent argues that particularly in the context of the federal government, contractors are treated differently from employees, for example, in their eligibility for health insurance plans, pension plans, leave, and other benefits. Id. Respondent further argues that the principles of sovereign immunity require the undersigned to construe any ambiguity in favor of immunity. Id. at 5.

On August 27, 2013, petitioner filed a response to respondent's motion for summary judgment. Petitioner argues that as a government contract worker stationed in Afghanistan, petitioner was either a member of the Armed Forces or a federal employee. Opp. Mot. Summ. J. Petitioner argues that the Vaccine Act is ambiguous and should be construed in context with the liberal and inclusive policy behind the statute. Id. at 8–9. He argues that construing the statute to exclude petitioner would lead to absurd results. Id. at 8. Petitioner cites Rooks v. Secretary of HHS, 35 Fed. Cl. 1 (Fed. Cl. 1996), which rejected a narrow construction of the word "receive" in a case dealing with whether a fetus in utero received a vaccination when his mother received it. Opp. Mot. Summ. J. at 8–10. Petitioner also discusses Andrews v. Secretary of HHS, No. 90-3196V, 1996 WL 300644 (Fed. Cl. Spec. Mstr. 1996), in which then-Special Master Abell concluded that an engineer working in conjunction with the United States Department of State, Agency for International Development ("USAID") was a federal employee, using an analysis based on whether the employee acted on "behalf" of the United States and whether the United States exhibited the requisite quantum of "control." Opp. Mot. Summ. J. at 11–12. Petitioner

4

argues that contractors should be considered "de facto federal employees," especially given the increasingly "blended workforce" of civil servants, members of the military, and contractors. Id. at 13. Petitioner goes on to argue that he should be considered either a non-combatant civilian employee of the Armed Forces or a federal employee of the Department of Defense. Id. at 14. Alternatively, petitioner argues that he should not be penalized for failing to return to the United States within six months of his vaccination because he fully intended to return once his employment was over and thus did not "legally leave" the United States. Id. at 16. Petitioner also argues against a strict application of sovereign immunity. Id. at 16–17.

On September 10, 2013, respondent filed a Reply in Support of Respondent's Motion for Summary Judgment. Respondent focuses on language in the contract that "repeatedly disclaims" an employer/employee relationship between the United States government and contractor personnel. Reply at 1–2. Respondent argues that it would not be "absurd, futile or unreasonable" to construe the Vaccine Act to confer different legal rights and remedies upon Americans who work or travel overseas than upon those who remain in the United States Id. at 2. Respondent also argues that petitioner had the alternative of returning to the United States within six months of his vaccination in order to avail himself of eligibility under the Vaccine Program. Id.

On December 19, 2013, petitioner filed a Supplemental Response to Respondent's Motion for Summary Judgment. Petitioner argues that even though he filed a Defense Base Act claim, he will be prejudiced if his petition is dismissed from this Program, as this Program provides recovery for pain and suffering and for full wage loss. Suppl. Resp. at 3. Petitioner concedes that benefits received from his Defense Base Act claim would be offset by any award received in this Program. Id. Petitioner argues that a petitioner can have dual employers and that he was a dual employee of both Fluor and the Department of Defense ("DOD"). Id. at 3, 10. Petitioner discusses and compares this case to Harris v. Attorney General, 657 F. Supp. 2d 1, 12 (D.D.C. 2009), which held that an independent contractor for the Department of Justice was a federal employee for Title VII purposes. Suppl. Resp. at 3–5. In Harris, the D.C. District Court applied common law agency tests, including the test used in Spirides v. Reinhardt, 613 F.2d 826 (D.C. Cir. 1979),[2] to determine whether the Department of Justice retained sufficient control over Harris to qualify as her employer. Harris, 657 F. Supp. 2d 1. The district court eschewed the contract between the parties, as contracts do not necessarily reflect "economic realities" of an employment relationship. Id. at 10. Petitioner argues that he was a federal employee based on the level of control exerted over him by the military, including factors such as who provided the work environment and furnishings and whether his work was integral to the overall mission of the government. Suppl. Resp. at 6–8.

_____

[2] Spirides involved a foreign language broadcaster who brought a Title VII complaint against the United States International Communication Agency ("USICA"). 613 F.2d 826. The district court had found that USICA was not the plaintiff's employer and had dismissed her complaint on the grounds that her contract with USICA referred to her as an independent contractor. Id. at 827. The Court of Appeals for the District of Columbia Circuit reversed the district court's grant of summary judgment, holding that the determination of whether a person is an employee or an independent contractor requires an agency analysis considering all of the circumstances of the work relationship, including the "economic realities," and that consideration of the contract alone was insufficient. Id. at 831–33.

On January 21, 2014, respondent filed a Supplemental Reply in Support of Respondent's Motion for Summary Judgment. Respondent argues that the complex control analysis advocated by petitioner is irrelevant in the context of the Vaccine Program. Suppl. Reply at 2. Respondent argues that "because the Vaccine Act was intended to streamline resolution of vaccine claims . . . it is more reasonable to assume that Congress intended courts to use the easy-to-apply, plain meaning of the term 'employee.'" Id. at 2.

The issue has now been fully briefed and is ripe for a decision.

## ANALYSIS

### A. Legal Standard for a Motion for Summary Judgment

In order to grant a motion for summary judgment, a special master must find that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); U.S. Ct. Fed. Cl. R. 56(a); see Vaccine Rule 8(d) (authorizing summary judgment pursuant to Rule 56 of the U.S. Court of Federal Claims). The moving party bears the burden to show the absence of any genuine issue of material fact. Jay v. Sec'y of HHS, 998 F.2d 979, 982 (Fed. Cir. 1993). All of the non-movant's statements are regarded as true, and "all justifiable inferences" must be drawn in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 253, 255 (1986). However, a non-moving party must establish "more than the 'mere scintilla of evidence' in support of its position." Harris, 657 F. Supp. 2d at 7. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50.

The essential inquiry is "whether the evidence presents a sufficient disagreement of fact to require submission to the factfinder or whether it is 'so one-sided that one party must prevail as a matter of law.'" Jay, 998 F.2d at 982 (quoting Anderson, 477 U.S. at 251–52). "Summary judgment is appropriate if the non-movant fails to offer 'evidence on which the [factfinder] could reasonably find for the [non-movant].'" Harris, 657 F. Supp. 2d at 7 (quoting Anderson, 477 U.S. at 252). Whether a plaintiff or petitioner is a federal employee is an appropriate question for summary judgment. See, e.g., Lopez v. Johnson, 333 F.3d 959 (9th Cir. 2003); Harris, 657 F. Supp. 2d 1; Redd v. Summers, 232 F.3d 933 (D.C. Cir. 2000).

### B. The Vaccine Act's Requirements for Petitioners Who Received a Vaccine Outside of the United States

Among other requirements, in order to receive compensation for a vaccine injury, a petitioner must receive a vaccine under one of three circumstances. A person who "received the vaccine in the United States or in its trust territories" may be eligible for compensation. 42 U.S.C. § 300aa-11(c)(1)(B)(i)(I) (2006). Alternatively, even if a petitioner received a vaccine outside of the U.S. or its territories, a person may be eligible for compensation if either:

> at the time of the vaccination such person was a citizen of the United States serving abroad as a member of the Armed Forces or otherwise as an employee of the United States or a dependent of such a citizen, or . . . the vaccine was

6

manufactured by a vaccine manufacturer located in the United States and such person returned to the United States not later than 6 months after the date of the vaccination.

Id. § 300aa-11(c)(1)(B)(i)(II)–(III).

## C. Standards for Statutory Interpretation

The question of whether petitioner is eligible for compensation under § 300aa-11(c) raises an issue of statutory interpretation, which is an issue of law. Hellebrand v. Sec'y of HHS, 999 F.2d 1565, 1569 (Fed. Cir. 1993) (citing Munn v. Sec'y of HHS, 970 F.2d 863, 870 (Fed. Cir. 1992)). "It is a general rule of statutory construction that where Congress has clearly stated its intent in the language of a statute, a court should not inquire further." Hellebrand, 999 F.2d at 1569 (quoting Brookside Veneers, Ltd. v. United States, 847 F.2d 786, 788 (Fed. Cir. 1988)). If there is some ambiguity in a statute, "a court should seek to avoid construing a statute in a way which yields an absurd result and should try to construe a statute in a way which is consistent with the intent of Congress." Hellebrand, 999 F.2d at 1570–71 (citing Haggar Co. v. Helvering, 308 U.S. 389, 394 (1940) ("All statutes must be construed in light of their purpose. A literal reading of them which would lead to absurd results is to be avoided when they can be given a reasonable application consistent with their words and with the legislative purpose.")).

The United States is sovereign and no one may sue it without the sovereign's waiver of immunity. United States v. Sherwood, 312 U.S. 584, 586 (1941). Respondent argues that the principles of sovereign immunity require this Court to construe any ambiguity contained within the statute in favor of the government. Mot. Summ. J. at 5 (citing Holihan v. Sec'y of HHS, 45 Fed. Cl. 201, 207 (Fed. Cl. 1999); Flannery v. Sec'y of HHS, No. 99-963V, 2003 WL 1699396, at *8 (Fed. Cl. Spec. Mstr. Mar. 14, 2003)). Petitioner counters respondent's argument with more recent cases, which he argues demonstrate a departure from this strict view of sovereign immunity. Opp. Mot. Summ. J. at 16–17.

In Chickasaw Nation v. United States, the Supreme Court directed that "canons are not mandatory rules" but rather "are designed to help judges determine the Legislature's intent as embodied in particular statutory language." 534 U.S. 84, 94 (2001). In Richlin Security Service Co. v. Chertoff, the Court stated, "The sovereign immunity canon is just that—a canon of construction. It is a tool for interpreting the law, and we have never held that it displaces the other traditional tools of statutory construction." 553 U.S. 571, 589 (2008). In Richlin, after considering the legislative history and policy considerations for the statutory term at issue, the Court continued, "There is no need for us to resort to the sovereign immunity canon because there is no ambiguity left for us to construe." Id. at 590. Other special masters have viewed Richlin as a "substantial change" in the sovereign immunity doctrine, allowing for a more "liberal" construction of "remedial" legislation. See Castaneda v. Sec'y of HHS, No. 11-749V, 2012 WL 1722346, at *6 (Fed. Cl. Spec. Mstr. Apr. 24, 2012) (holding that the doctrine of sovereign immunity did not require a narrow construction of the term "receive" and that the petitioner's child "received" a vaccine while in utero); Burch v. Sec'y of HHS, No. 99-946V, 2010 WL 1676767, at *2–*7, *9 (Fed. Cl. Spec. Mstr. Apr. 9, 2010) (providing a thorough discussion of the Supreme Court's sovereign immunity cases through recent years and also

7

concluding that the petitioner's child "received" a vaccine while in utero).

In limiting its waiver of sovereign immunity, Congress created the requirements in § 300aa-11(c) as conditions precedent to suit. The undersigned's duty is to determine whether petitioner satisfied these conditions precedent, using traditional tools of statutory construction to ascertain the legislative intent. United States v. Am. Trucking Ass'ns, 310 U.S. 534, 542 (1940). The principles of sovereign immunity are one canon of construction. Richlin, 553 U.S. at 589. Other tools of statutory interpretation include an analysis of the legislative history to determine the underlying purpose of the statute. NLRB v. Bell Aerospace Co. Div. of Textron, Inc., 416 U.S. 267, 274–75 (1974).

When Congress passed the National Childhood Vaccine Injury Act of 1986, it intended to establish a "Federal 'no fault' compensation program under which awards can be made to vaccine-injured persons quickly, easily, and with certainty and generosity." H.R. Rep. No. 99-908, at 3 (1986). A need for such legislation arose due to vaccine manufacturers' difficulty in obtaining insurance during the 1980s, resulting in the rising cost of vaccines and decreased availability of vaccine manufacturers. S. Rep. No. 99-483, at 5 (1986). A stated legislative purpose of the Vaccine Act was the federal government's "responsibility to prevent the spread of infectious diseases from other countries into the United States and between States within its own borders." H.R. Rep. No. 99-908, at 5 (1986). Congress attempted to make the Vaccine Injury Compensation Program "fair, simple, and easy to administer" so that vaccine manufacturers would "have a better sense of their potential litigation obligations," and "a more stable childhood vaccine market" would evolve. Id. at 7.

This no-fault compensation program was intended to be simpler and more expeditious and to provide more certain recovery than traditional tort litigation based on negligence. Id. at 6–7. In the 1989 amendments, Congress reiterated its intent that the Program operate informally and expeditiously:

> Congress intended a quick, flexible, and streamlined system . . . . The system was intended to be "fair, simple, and easy to administer" and "to compensate persons with recognized vaccine injuries without requiring the difficult individual determinations of causation and injury."

H.R. Rep. No. 101-386, at 512 (1989). Vaccine proceedings were meant to "be made as swift and uncomplicated as possible." Id. at 515.

"The scope of the Vaccine Act does not extend beyond the borders of the United States. The name itself refers to a 'national' act." McGowan v. Sec'y of HHS, 31 Fed. Cl. 734, 739 (Fed. Cl. 1994) aff'g No. 90-2446V, 1994 WL 879451 (Fed. Cl. Spec. Mstr. May 10, 1994) (holding that a person who received a vaccine outside the United States did not satisfy the Vaccine Act's requirement that she return to the United States by merely visiting the United States). When creating the Vaccine Act, Congress was not concerned with "the continued supply of vaccines outside the United States or the compensation of non-residents of the United States, save for United States Government and military personnel stationed abroad." Id. With respect to § 300aa-11(c), the legislative history states only that "[a] petition must contain a variety of

materials necessary to make a finding that compensation be made," including "evidence that the person on behalf of whom the petition is filed . . . met certain citizenship or location restrictions." H.R. Rep. No. 99-908, at 15 (1986) (cited in McGowan, 31 Fed. Cl. at 739 n.2). It is logical that these citizenship and location restrictions are related to Congress's stated purpose of preventing infectious diseases from reaching the United States. See McGowan, 31 Fed. Cl. at 739. Congress realized that it could not prevent infectious diseases from entering our borders without encouraging Americans who are overseas and are likely to return to the United States to receive vaccinations before returning. Id. Thus, it created three categories of people who could file a petition after receiving a vaccine overseas: (1) American citizens serving overseas as members of the Armed Forces or federal employees, (2) dependents of American citizens serving overseas as members of the Armed Forces or federal employees, and (3) persons who received a vaccine created by an American vaccine manufacturer and who returned to the United States within six months of vaccination. If these categories of persons overseas were not vaccinated, when they returned to the United States, they could potentially spread disease within American borders.

Considering the principles of sovereign immunity as well as the clearly stated legislative purpose that the Vaccine Act be a national program that prevents the spread of infectious disease from other countries within this country's borders, the undersigned will now analyze whether petitioner falls within the exceptions listed in § 300aa-11(c).

### 1. Petitioner did not return to the United States within six months of his vaccination, as required by § 300aa-11(c)(1)(B)(i)(III).

Petitioner did not return to the United States within six months of his vaccination. A person who receives a vaccine made by an American vaccine manufacturer and who returns to the United States within six months of his or her overseas vaccination may bring a petition in the Vaccine Program. 42 U.S.C. § 300aa-11(c)(1)(B)(i)(III). As Judge Nettesheim noted in McGowan, "There is no guidance as to why Congress drew a line at six months, yet Congress did so and the court must honor it." 31 Fed. Cl. at 739 (citing Amendola v. Sec'y of HHS, 989 F. 2d 1180, 1182 (Fed. Cir. 1993) ("When a statute expresses its purpose in short, clear terms, the duty of the court is to apply the statute as written.")).

Additionally, § 300aa-11(c)(1)(B)(i)(III) has been interpreted to require a permanent return, meaning "an injured person must return to the United States within six months of the vaccination date, with the intention to remain permanently from that point on." McGowan, 31 Fed. Cl. at 740, aff'g No. 90-2446V, 1994 WL 879451 (Fed. Cl. Spec. Mstr. May 10, 1994). In McGowan, the undersigned held that a mere physical presence within the United States was not enough to qualify as a "return." 1994 WL 879451 at *4. In that case, the petitioner received a vaccination in Canada, where she resided for two years. Id. at *1. She travelled to the United States several times within six months of her vaccination to visit her grandparents for three to four days at a time. Id. at *3. The undersigned found that a "mere physical presence" without a "resumption of domicile" was insufficient "to constitute a 'return' to the United States." Id. at *4. Judge Nettesheim affirmed on appeal:

> To rule that "return" means simply to physically enter the United States is to
> invite absurd scenarios. As the transferee special master noted, such a

9

construction would allow expatriate Americans who have emigrated to other countries or non-citizens who have visited the United States merely to return and spend the day in the United States eligibility to petition and take advantage of the compensation program's ease and funding. It defies logic that Congress would intend "return" to allow a physical presence without any intent to remain or any duration requirement, especially where the potential of affording compensation to visitors of the United States is present.

McGowan, 31 Fed. Cl. at 739–40 (internal citations omitted).

Petitioner resides in the Philippines and has not returned to the United States since his vaccination. Petitioner argues that he should be viewed as never having "left" the United States because he never intended to give up his domicile in the United States. Opp. Mot. Summ. J. at 15–16. Under petitioner's suggested interpretation, a "return" would require only a subjective intent to return to the United States, without any requirement of physical presence or duration. "[A] court should seek to avoid construing a statute in a way which yields an absurd result and should try to construe a statute in a way which is consistent with the intent of Congress." Hellebrand, 999 F.2d at 1570–71 (quoted in McGowan, 31 Fed. Cl. at 739). The undersigned rejects petitioner's interpretation of "return" as requiring subjective intent without physical presence. McGowan stands for the premise that both a physical presence and a subjective intent to remain in the United States are required to meet the Vaccine Act's "return" requirement. Congress unequivocally required a petitioner receiving a vaccination overseas to return to the United States within six months of his vaccination, unless he is a member of the Armed Forces or a federal employee. It is clear that Mr. Griffin does not qualify as a petitioner under § 300aa-11(c)(1)(B)(i)(III).

### 2. **Petitioner is not a member of the Armed Forces or a federal employee, as required by § 300aa-11(c)(1)(B)(i)(II).**

#### a. **Member of the Armed Forces**

Petitioner is not a member of the Armed Forces. The "'Armed Forces' means the Army, Navy, Air Force, Marine Corps, and Coast Guard." Gonzalez v. Dep't of Army, 718 F.2d 926, 928 (9th Cir. 1983) (quoting 10 U.S.C. § 101(4) (2012)). Reserve members and National Guard members may also be considered members of the Armed Forces. See U.S. Armed Forces Overview, Military.com, http://www.military.com/join-armed-forces/us-military-overview.html (last accessed March 25, 2014). In contrast, petitioner repeatedly refers to himself as a "civilian government employee." A civilian is generally defined as a person who is not a member of the military or Armed Forces. See Webster's Ninth New Collegiate Dictionary 244 (1980) (defining a "civilian" as "one not on active duty in a military, police, or fire-fighting force"). While petitioner complied with certain requirements imposed by the Army, such as medical clearances, he did not undergo basic training or any of the other steps that are indicia of being a member of the Armed Forces. No source that the undersigned has found has identified civilians such as petitioner to be "members of the Armed Forces." For these reasons, it is unlikely that Congress intended a civilian employee of a defense contractor to be considered a "member of the Armed Forces."

A020

## b. **Federal Employee**

Petitioner is not a federal employee. It is unlikely that Congress meant to include private contract employees, each of whom may be under varying levels of control by the federal government, as federal employees. Even under a common law agency analysis, the federal government did not exert enough control over the manner and means of petitioner's employment to qualify as his employer or joint employer. An analysis of the contract belies any representation by petitioner that it was his belief that the government was his employer. Most of the aspects of his employment were controlled by Fluor, not the Department of Defense.

### i. **Meaning of "Employee"**

The Vaccine Act does not define "employee." Various definitions exist throughout case law, statutory law, and dictionary definitions. Most common dictionary definitions for "employee" focus on receiving payment for one's services. Webster's Dictionary defines an employee as "one employed by another usu. for wages or salary and in a position below the executive level." Webster's Ninth New Collegiate Dictionary 408 (1989); see also Random House Dictionary of the English Language 638 (2d ed. 1987) ("a person working for another person or a business firm for pay"); American Heritage Dictionary 450 (2d College ed. 1985) ("a person who works for another in return for financial or other compensation").

The Supreme Court has directed that where Congress does not clearly indicate otherwise, courts should use common law agency principles to determine whether someone is an "employee." Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322–23 (1992) (discussing that under both the Copyright Act of 1976 and the Employee Retirement Income Security Act of 1974 ("ERISA"), the common law agency test should be used). The Court stated that it is a

> "well established" principle that "[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms. . . . In the past, when Congress has used the term 'employee' without defining it, we have concluded Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine."

Id. (quoting Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 739–40 (1989)). The Court noted that ERISA's "definition of 'employee' as 'any individual employed by an employer' . . . is completely circular and explains nothing." Darden, 503 U.S. at 323 (citation omitted). The Court then summarized its common law agency test:

> "In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between parties; whether the hiring party has the right to assign additional projects to the hired party; the extent

11

of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

Id. (quoting Reid, 490 U.S. at 751–52). "No one of these factors is determinative." Reid, 490 U.S. at 752.

The Court also cited the Second Restatement, which lists various factors related to the common law agency analysis:

In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered: (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business.

Restatement (Second) of Agency § 220(2) (1958) (cited in Darden, 530 U.S. at 324). The Court stated, "[s]ince the common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" Darden, 530 U.S. at 324 (quoting NLRB v. United Ins. Co. of America, 390 U.S. 254, 258 (1968)).

Petitioner relies heavily on the interpretation of employment relationships under Title VII[3], arguing that he had joint employers: while he was undoubtedly an employee of Fluor, he also saw himself as a federal employee controlled substantially by DOD. See Suppl. Resp. at 10. Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating based on race, sex, color, religion, and national origin. 42 U.S.C. § 2000e (2006). The Equal Employment Opportunity Act of 1972 expanded upon Title VII, protecting "employees or applicants for employment" in federal executive agencies and defined units of other branches from discrimination. 86 Stat. 111 § 717 (1972) (codified as 42 U.S.C. § 2000e-16(a) (2006)).

---

[3] Petitioner also cites International Union v. Clark, 2006 WL 2598046 (D.D.C. Sept. 11, 2006), in which the court used a joint employment test to determine whether the federal government exercised sufficient control over Court Security Officers ("CSOs") for the purposes of the CSOs' suit under the Rehabilitation Act of 1973.

Under Title VII, courts have determined that a person can have dual employers in both the context of private employers and government employers. See <u>Magnuson v. Peak Technical Serv., Inc.</u>, 808 F. Supp. 500 (E.D. Va. 1992) (addressing private employers); see also <u>Harris v. Att'y Gen.</u>, 657 F. Supp. 2d 1 (D.D.C. 2009); <u>King v. Dalton</u>, 895 F. Supp. 831 (E.D. Va. 1995); <u>Spirides v. Reinhardt</u>, 613 F.2d 826 (D.C. Cir. 1979) (all addressing public employers). Courts have used the eleven-factor test articulated in <u>Spirides</u> to determine whether the putative employer possesses the "right to control the 'means and manner' of the worker's performance." <u>Spirides</u>, 613 F.2d at 831. Other courts have referred to the <u>Spirides</u> test as a "hybrid employment test (which combines the economic realities test and the common law agency test)." <u>Lopez v. Johnson</u>, 333 F.3d 959, 962 (9th Cir. 2003). Under the <u>Spirides</u> test, the most important factor is the employer's right to control the individual's work, but other relevant factors are considered, including:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; [i].e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

<u>Spirides</u>, 613 F.2d at 832 (quoted in <u>King</u>, 895 F. Supp. at 838). This test also demands analysis of the "'economic realities' of the work relationship," looking at the totality of the circumstances. <u>Spirides</u>, 613 F.2d at 831. Additionally, the <u>Harris</u> court looked at the "parties' understandings of their anticipated roles," as well as whether the individual's tasks were "integral to the [putative employer's] overall mission." <u>Harris</u>, 657 F. Supp. 2d at 10–11. Petitioner focuses heavily on the two latter factors in his briefs.

Petitioner cites to the only other case addressing this specific issue in this Program, in which then-Special Master Abell analyzed the meaning of "employee" within § 300aa-11(c)(1)(B)(i)(II) of the Vaccine Act. <u>Andrews v. Sec'y of HHS</u>, No. 90-3196V, 1996 WL 300644 (Fed. Cl. Spec. Mstr. May 22, 1996). Special Master Abell's decision is not binding on the undersigned. "It is well-settled that '[s]pecial masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand.'" <u>Rickett v. Sec'y of HHS</u>, 468 F. App'x 952, 959 (Fed. Cir. 2011) (quoting <u>Hanlon v. Sec'y of HHS</u>, 40 Fed. Cl. 625, 630 (Fed. Cl. 1998), aff'd, 191 F.3d 1344 (Fed. Cir. 1999)). Nevertheless, <u>Andrews</u> is relevant. In <u>Andrews</u>, Special Master Abell, looking to the surrounding statutory terms and purpose of the Vaccine Act, concluded that "one's status as a federal employee need not be formal." <u>Id.</u> at *4. He reasoned that since the Vaccine Act mentions the employment relationship "only in the context of the person's presence outside the United States," the key aspect within the employment relationship is the authority to assign the

13

person to a location outside of the United States.  Id. at *5.  Special Master Abell held that employees are persons

> who act, formally or informally, in an official capacity on behalf of the United States, or who perform services for the United States similar to those who are otherwise considered employees of the federal government, regardless of the source of salary or wage.  Additionally, the United States must be able to exercise that quantum of control relevant to this Act, *viz.*, authority to station personnel extra-territorialy [sic].

Id.  He concluded that the petitioner's father was an employee of the United States because, even though his employment contract was with the Near East Foundation rather than with USAID, he served the United States' interest by performing services that the United States was contractually obligated to perform, maintained an office at the United States Embassy, underwent a security clearance, and was subject to USAID leave regulations.  Id. at *1, *6–*7.  He emphasized the importance of the State Department's issuing a diplomatic passport to petitioner's father, finding it indicated a "close, official relationship with the United States."  Id. at *6.  He found the diplomatic passport "the most compelling evidence that petitioner's father was a federal employee."  Id.  He also found that USAID controlled petitioner's father because it determined whether he could take leave out of the country.  Id. at *7.

Special Master Abell found it sufficient to qualify under the Vaccine Act as a federal employee if a person acted in an official capacity on behalf of a federal agency or performed personal services similar to the services of a civil officer or federal employee.  Id. at *5.  He found the key aspect of employment status was the employer's authority to assign the person in question outside United States' territory.  Id.  The undersigned disagrees with Special Master Abell's analysis of the meaning of "an employee of the United States" within the Vaccine Act. 42 U.S.C. § 300aa-11(c)(1)(B)(i)(II).  As mentioned previously, the Supreme Court has directed that, unless Congress has indicated otherwise, common law agency analysis should be used to determine a person's status as an employee, and the factors emphasized by Special Master Abell (whether someone acted in an official capacity or whether an employer had the authority to assign a person overseas) are not emphasized in general agency law.  Darden, 503 U.S. at 322–23.  Special Master Abell asserted that the reason federal employees need not demonstrate they received a vaccine manufactured in the United States or returned to the United States within six months of their vaccination, as individuals under § 300aa-11(c)(1)(B)(i)(III) must do, "must lie in the federal government's authority to locate individuals extra-territorially in order to accomplish national objectives," but there is no evidence that this was Congress's reasoning. Andrews, 1996 WL 300644, at *5.  The legislative history is silent as to the reason Congress gave preferential treatment to members of the military and federal employees overseas in comparison to other Americans overseas.  The undersigned also notes the factual differences between Andrews and the instant action.  In this case, petitioner did not have a diplomatic passport, and he was required to avoid creating the impression that he was a member of the military or a federal employee.  Nor is there any evidence that the military, rather than Fluor, determined where petitioner would be located.

14

###### ii.      Common Law Agency Analysis

Given the overwhelming legal authority applying traditional agency law when Congress fails to satisfactorily define "employee" within a statute, the undersigned concludes that the traditional agency test is the appropriate test to apply in this circumstance.  See Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992); New York Life Ins. Co. v. United States, 190 F.3d 1372, 1382 (Fed. Cir. 1999); Bender v. Suburban Hosp., Inc., 159 F.3d 186, 190 (4th Cir. 1998); Frankel v. Bally, Inc., 987 F.2d 86, 90 (2d Cir. 1993).  The undersigned will apply the factors given by the Supreme Court and in the Second Restatement of Agency.  Since petitioner has focused heavily on the Spirides factors, which are highly similar to those considered under the traditional agency test, the undersigned will also analyze those factors.  More simply stated, the question is whether, under the totality of the circumstances, the federal government exhibited the requisite control over the manner and means of petitioner's employment to qualify as his employer.

First, one must analyze the level of control the government exercised over the details, manner and means, and hours of petitioner's work.  Reid, 490 U.S. at 751; Restatement (Second) of Agency § 220(2); Spirides, 613 F.2d at 832.  This is often the most important factor.  Spirides, 613 F.2d at 831.  The government exhibited some control over petitioner's employment. Petitioner emphasizes the Army's authority to set hiring qualifications as evidence of its control. For example, employees of Fluor were required to pass DOD health, security, and background clearances.  Ex. 11, at 5, 30.  The contract also provides that the government retains control in certain areas related to safety of contractor personnel.  For example, the State Department has responsibility for evacuating non-essential personnel in an emergency.  Id. at 30.  The government also retains federal jurisdiction over contractor personnel in the event that they commit a crime while abroad and serving alongside the Armed Forces.  Id. at 33.  In the undersigned's view, these areas of control reserved by the government are not highly significant in terms of an employer/employee relationship.  These areas relate not to the everyday performance of the agent's duties, but rather are understandable and necessary measures related to the safety and security of both the contractor employees and members of the military. Traditional agency analysis has tended to focus on the level of control over the day-to-day physical details of the agent's job.[4]

---

[4] For example, the Restatement defines an agent as "a person employed to perform services in the affairs of another and who with respect to the *physical conduct* in the performance of the services is subject to the other's control or right to control."  Restatement (Second) of Agency § 220(1) (emphasis added). Comment E of the Second Restatement elaborates on this point:

> Those rendering service but retaining control over the manner of doing it are not servants. They may be agents, agreeing to use care and skill to accomplish a result and subject to the fiduciary duties of loyalty and obedience to the wishes of the principal; or they may be persons employed to accomplish or to use care to accomplish physical results, without fiduciary obligations, as where a contractor is paid to build a house. An agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to such conduct as one who agrees only to accomplish mere physical results. For the purpose of determining liability, they are both "independent contractors" . . . .

15

Furthermore, even though the government required that petitioner pass various clearances, Fluor was the responsible party for ensuring that these criteria were met. The contract provided that Fluor was responsible for ensuring that employees were medically and physically fit and stated that immunizations and pre-deployment medical screenings were to be provided at Fluor's expense. Ex. 11, at 30; Ex. 15, at 4. It also provided that Fluor was responsible for providing another qualified employee if the government determined that a contractor employee did not meet the requisite health or security requirements. Ex. 11, at 31. In fact, it was Fluor, not the Army, who notified petitioner when he passed his security clearance. Ex. 19, at 2.

Fluor was responsible for other important areas related to petitioner's employment as well. The contract provided that Fluor was responsible for obtaining passports, visas, and other required documents for its employees. Ex. 11, at 31. (This differs from a key factor in Andrews, 1996 WL 300644 at *6, where Special Master Abell found it highly significant that the petitioner's father in that case was granted a diplomatic passport.)

Consistent with a traditional agency analysis, petitioner also asserts that his day-to-day activities were controlled by the military. He states that most of his daily contact was with military members and that he had weekly meetings with military commanders, in which they discussed action items, progress on previous action items, deadlines, and materials needed. Griffin Decl. ¶ 7, Dec. 18, 2013. Petitioner also met weekly via telephone with his Fluor supervisor, along with ten other site managers. Id. He asserts that he reported to his Fluor supervisor, but military officers instructed him as to his duties. Id. Petitioner writes in his affidavit, "The government, through their regulations, controlled how my job duties were done and how decisions were made." Id. at ¶ 11. Again, the undersigned does not find these aspects of control to be determinative of an employer/employee relationship. Agency analysis tends to focus on the principal's control of the *physical details* of a servant's actions. See supra note 4. Rather than providing factual details indicative of control, petitioner provides mostly conclusory statements that the government was "calling the shots." Griffin Decl. ¶ 7, Dec. 18, 2013. It is unsurprising that much of petitioner's daily contact was with military members, as the purpose for Fluor being in Afghanistan was to support military operations. In fact, petitioner met weekly with both his Fluor supervisor and with government officials, thus indicating that Fluor had at least an equivalent level of control over the details of his work. Military officers may have been directing petitioner as to the results they wanted him to achieve, but petitioner has not presented facts that the military controlled the "manner of" achieving those results. Spirides, 613 F.2d at 831–32 ("If an employer has the right to control and direct the work of the individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist."); see also supra note 4. Petitioner asserts that he "discussed" his responsibilities with military officials at weekly meetings. Griffin Decl. ¶ 7, Dec. 18, 2013. This suggests that he was not merely taking orders. Moreover, petitioner's description of himself as a skilled worker with knowledge about various construction areas and an understanding of Army regulations suggests that he used these skills to exercise independent judgment in his management decisions.

---

Id.

Another factor to consider is whether petitioner's work was a "part of [the Army's] regular business," Restatement (Second) of Agency § 220(2), or stated another way, whether it was part of the Army's "integral" business. Spirides, 613 F.2d at 832. Related to this analysis is whether petitioner had specific skills that would weigh in favor of his being an independent contractor. Reid, 490 U.S. at 751; Restatement (Second) of Agency § 220(2); Spirides, 613 F.2d at 832; see also Izard v. United States, 946 F.2d 1492, 1494 (10th Cir. 1991) (reciting state law agency tests under which, "[i]f the contract work is specialized *per se*, it is not, as a matter of law, part of the principal's trade, business, or occupation"); Restatement (Second) of Agency § 220(2), Comment H (noting that "work which does not require the services of one highly educated or skilled" is a factor indicating a master/servant relationship).

Fluor provided support services to DOD, including food services, latrines, waste management, facilities and construction management. Ex. 11, at 16. Petitioner was a site manager in Afghanistan. Griffin Decl. ¶ 12, Dec. 18, 2013. He describes his job as akin to a project manager. Id. His job required knowledge about "budgeting, the military's network, supervising, ordering of supplies, communicating, as well as . . . a basic knowledge regarding laundry, showers, latrines . . . plumbing, electrical, and cooking." Id. Petitioner notes that his knowledge and management of all these areas were based upon Army regulations. Id. Petitioner asserts that he "was hired to do a specialized job that was part of the military's mission." Id. at ¶ 10. Focusing on the Harris decision, in which the District Court applied the Spirides factors, petitioner argues that his work was "integral to the overall mission" of the military. Harris, 657 F. Supp. 2d at 11. Petitioner argues that subcontractors like himself are "akin to the 'Draft.'" Griffin Decl. ¶ 10, Dec. 18, 2013. He argues that if the military did not employ subcontractors, soldiers would have to do the jobs that the subcontractors currently carry out. Id.

While it is true that petitioner's job was necessary to the business of the military, petitioner's argument misconstrues the purpose of this factor in an agency analysis. In Harris, the District Court of the District of Columbia found that an independent contractor working as a Personnel Security Specialist at the Executive Office of United States Attorneys ("EOUSA") of the Department of Justice was a federal employee. In that case, one of EOUSA's "stated 'major functions' [was] to '[p]rovide operating personnel and security administrative services." 657 F. Supp. 2d at 11. The stated mission of DOD is to "provide the military forces needed to deter war and to protect the security of our country." About the Department of Defense (DOD), U.S. Department of Defense, www.defense.gov/about/ (last visited March 28, 2014). Unlike the Harris plaintiff who was herself carrying out a core function of the organization, Mr. Griffin provided support services, which though necessary, were secondary to the core mission of the military. Additionally, the fact that he describes himself as doing a specialized job with specific skills weighs in favor of an independent contractor relationship.

Additional factors considered in an agency analysis are the location of the employee's work and whether he provided his own tools and instrumentalities. Reid, 490 U.S. at 751; Restatement (Second) of Agency § 220(2); Spirides, 613 F.2d at 832. In this case, the contract provides that the government furnish the place of performance and the property necessary for Fluor's provision of support services. Ex. 11, at 28. Petitioner argues that the military controlled his work environment and furnishing, since he worked on the military base. Suppl. Resp. at 7. He asserts that the government controlled his office space, equipment, and supplies, including

17

calculators, pens, and paper. Griffin Decl. ¶ 13, Dec. 18, 2013. He states that the government was required to sign off on all requisitions for the equipment or materials necessary to do his job. Id. This factor does weigh in favor of an employer/employee relationship. However, as stated above, no single factor in an agency analysis is determinative. Reid, 490 U.S. at 752. Moreover, the contract provides that the contractor (Fluor) is to provide the government with a list of all property required to fulfill their contractual obligations, Ex. 11, at 29, meaning that Fluor maintained some level of control over the tools and instrumentalities used during the work.

Another factor to be considered under the Spirides test is the method of termination. Spirides, 613 F.2d at 832. Petitioner argues that United States Army officials had control over his performance reviews and had the power to have him fired if they were not pleased with his work performance. Griffin Decl. ¶ 8, Dec. 18, 2013. However, petitioner gives no details as to how the military influenced his performance reviews. The contract provides that "government representatives may advise the Contractor of any poor performance *in order to provide the opportunity for improvement* during the evaluation period." Ex. 11, at 35 (emphasis added). Although the government could direct Fluor to "remove" contract personnel for failure to comply with the contract, Id. at 75, it does not give the government the power to fire petitioner. Rather, petitioner concedes that Fluor had the ultimate authority to terminate his employment. Supp. Resp. at 8. Thus, the method of termination factor weighs in favor of Fluor being petitioner's employer.

Other relevant factors include the method of payment and an employee's benefit and tax treatment. Reid, 490 U.S. at 751–52; Restatement (Second) of Agency § 220(2); Spirides, 613 F.2d at 832. The contract specifies a schedule and criteria for the amount of fees awarded to Fluor. Ex. 11, at 35–36. In addition, the contract provides that the government will not reimburse the contractor for any costs deemed unreasonable, and that any base pay or allowance increases in excess of 10% should be approved by the contracting officer. Ex. 11, at 37.

Petitioner was paid an hourly rate by Fluor. Ex. 8, at 2–3; Ex. 9, at 1–2. Federal income taxes were taken from his Fluor paycheck. Ex. 9, at 1–3. There is no evidence that he received retirement benefits through the federal government. He was not eligible for Tricare or other federal government employee health benefit plans. His health and dental care were provided through Fluor. Ex. 9, at 1–3; Ex. 20, at 1 (identifying "Chartis" as his health insurance carrier). In fact, the contract explicitly limits the government's responsibility to provide medical care to contractor personnel, authorizing only emergency medical care, the cost of which was to be reimbursed by Fluor. Ex. 11, at 31. Petitioner received the flu vaccine at a Fluor medical clinic. Ex. 5, at 3. When petitioner became ill, his medical treatment was authorized by a physician at Fluor Medical Clinic, not at a medical clinic operated by the Army. Ex. 20, at 1. Each of these factors involving payment and employment benefits indicates that he was an employee of Fluor, not an employee of the federal government.

Another factor is the belief or intent of the parties regarding their employment relationship. Restatement (Second) of Agency § 220(2); Spirides, 613 F.2d at 832. While petitioner asserts that he felt as if he were a member of the Armed Forces and a federal employee, all objective evidence manifests the parties' clear intent that Fluor be treated as an independent contractor and that Fluor's employees not be treated as federal employees. The

contract between Fluor and the government states that "the awardee [Fluor] will operate as an independent contractor and not as an agent of the U.S. Government or U.S. Army." Ex. 11, at 3. It specifies that "[c]ontractor personnel are prohibited from wearing military clothing unless specifically authorized," and even then, contractor personnel must "[w]ear distinctive patches, arm bands, nametags, or headgear, in order to be distinguishable from military personnel." Id. at 75. It also states:

> All contractor personnel attending meetings, answering Government telephones, corresponding by email and working in other situations where their contractor status is not obvious to third parties are required to identify themselves as such to avoid creating an impression that contracted personnel are Government employees, or official representatives of a Governmental organization.

Id. at 19. The contract required that contractors wear badges, from which an individual could identify them as a contracted employee by a minimum distance of ten feet. Id.

Based on the contract language and petitioner's treatment while on base, it is apparent that there was a clear distinction between contractor employees and federal employees/members of the Armed Forces. Additionally, petitioner listed Fluor as his employer in his workers' compensation claim, thus exhibiting that he understood himself to be an employee of Fluor—not a member of the Armed Forces or federal employee. Ex. 20, at 1, 3, 5.

A comparison to other cases reinforces the conclusion that petitioner was the employee of an independent contractor rather than a federal employee. In International Union v. Clark, a case cited in petitioner's brief, the District Court of the District of Columbia determined that Court Security Officers ("CSOs") were joint employees of both the United States Marshal Services ("USMS") and private contractors. 2006 WL 2598046 (D.D.C. 2006). In that case, the contractors conducted initial employment screenings, paid the CSOs' salaries, provided their benefits, withheld taxes on their behalf, maintained their time and attendance records, and had the ultimate power to terminate their employment. Id. at *2. However, USMS set medical, physical, and weapons proficiency standards; interviewed prospective CSOs; performed background checks; supplied essential equipment; conducted the bulk of the CSOs' training; performed performance reviews based on specific standards; determined the CSOs' daily duties; and retained the power to decide whether the CSOs should be removed from the contract for failure to meet the qualifications USMS set for the job (which invariably led to termination of the CSO's employment by the contractor). Id. at *6–*8.

In Harris v. Attorney General, the District Court for the District of Columbia found that a Personnel Security Specialist working in the Executive Office for United States Attorneys ("EOUSA") in the Department of Justice was a federal employee. 657 F. Supp. 2d 1 (D.D.C. 2009). In that case, an independent contractor hired the plaintiff, but EOUSA screened and interviewed her before she was hired. Id. at 3. EOUSA supervised contractor employees, set their schedules and duties, and gave them performance evaluations, while the independent contractor supervisor had very little contact with the contractor employees and acted "more as a liaison." Id. at 11. EOUSA provided the location and essential equipment for work. Id. at 12. The court found that the plaintiff's services were "integral to [EOUSA's] business" and that

contractor employees provided the same services and received the same supervision as federal employees at EOUSA.  Id. at 11–12.  Thus, even though the contractor provided the plaintiff's salary, benefits, and vacation time; withheld Social Security taxes on her behalf; and had the ultimate authority to terminate the plaintiff, EOUSA exercised greater control over the plaintiff's employment.  Id. at 11–13.

In contrast, in Redd v. Summers, the Court of Appeals for the District of Columbia Circuit found that a contract employee who worked as a tour guide in the Treasury Department's Bureau of Engraving and Printing was not a federal employee. 232 F.3d 933 (D.C. Cir. 2000). In that case, the Treasury Department provided the equipment used and place of work.  Id. at 939–40.  The court also determined that the plaintiff's Treasury Department supervisor involved herself in the "means and manner" of the plaintiff's work for "one short period," when the supervisor helped the plaintiff to "improve her tour presentation over the course of five or six meetings."  Id. at 938.  However, the court found that these factors were outweighed by the factors indicating that the contractor was her employer: the Treasury Department did not train plaintiff; the contractor provided the majority of supervision over the "means and manner" of plaintiff's work performance; tours were part of the Treasury Department's public relations, not an integral part of its business; the contractor retained sole authority to terminate the plaintiff, even though the contract allowed the Treasury Department to reject any guide; and the contractor paid the plaintiff's wages, provided her vacation time, and paid Social Security taxes on her behalf.  Id. at 938–40.

A comparison of petitioner's case to that of the CSOs in Clark reveals fewer factors weighing in favor of federal employment.  In contrast to Clark, where USMS was involved in the hiring, training, and background clearances of the CSOs, petitioner has not presented any evidence that the Army trained him or interviewed him during his hiring process, and it was Fluor who oversaw his medical and security clearances, not the Army.  This case can also be distinguished from Harris.  Petitioner's Fluor supervisor certainly acted as more than a nominal supervisor or a liaison with the Army, as shown by her weekly meetings with petitioner.  Unlike in Harris where contractor personnel performed essentially the same services as federal employees, there is no evidence that federal employees or members of the military performed duties similar to petitioner.  The level of control over the manner and means of petitioner's work performance is also less significant than in Clark and Harris, where the government determined the daily duties and tasks of contractor personnel and monitored their time and attendance.  Here, the Army did not significantly control the means and manner of petitioner's work performance— petitioner merely had meetings with Army officials and was influenced by Army regulations, factors that could be present in many independent contractor relationships.  Also, as discussed above, petitioner's duties were not a part of the military's "integral business."  Rather, this case is more like Redd.  As in Redd, even though the contract gave the government power to remove or reject contractor personnel, the independent contractor retained the ultimate authority to terminate its employees.  Just as in Redd, the federal government provided the equipment used and place of work, but the contractor trained petitioner, paid his salary and Social Security taxes, and provided his vacation time.

In sum, petitioner was the employee solely of the independent contractor Fluor, rather than a federal employee or a joint employee of the government and Fluor.  While the government

exhibited some control over petitioner in the form of requiring security and medical clearances, supplying the location and tools for employment, engaging in weekly meetings and daily contact with petitioner, and contributing to petitioner's evaluations, the majority of factors, including those that are the most objective and easy to ascertain, weigh in favor of petitioner being the employee solely of the independent contractor, Fluor. He was a skilled worker doing specialized support work for the military. The contract repeatedly refers to the relationship as that between an employer and an independent contractor. Fluor paid petitioner, provided his health benefits, gave him vacation time, and was considered his employer for tax purposes. Fluor hired petitioner and retained the authority to terminate him.

There is "no genuine dispute as to any material fact" presented. Fed. R. Civ. P. 56(a). Even when interpreting "all justifiable inferences" in favor of petitioner, Jay, 998 F.2d at 982, petitioner has not presented probative evidence to show he was a federal employee or member of the Armed Forces. Rather, the evidence shows that he was solely the employee of Fluor, an independent contractor.

Contrary to petitioner's assertion that the Vaccine Act's legislative purpose requires a broad interpretation of "employee" to include federal contract employees, the undersigned finds significant legislative history supporting a more narrow approach. As the Federal Circuit has stated, "We cannot disturb the legislative choices Congress made in adopting this compensation scheme." Tembenis v. Sec'y of HHS, 733 F.3d 1190, 1199 (Fed. Cir. 2013), rev'g 2012 WL 5395405 (Fed. Cl. Oct. 19, 2012), denying review, 2012 WL 3744722 (Fed. Cl. Spec. Mstr. July 31, 2012), cert. pending, 2014 WL 325699 (U.S. Jan. 24, 2014) (holding that Congress did not choose to permit an award of future lost wages in cases where the petitioner dies prior to compensation judgment). The undersigned cannot ignore the limits Congress imposed on persons vaccinated overseas, as well as within the United States. The Vaccine Program is grounded in a limited waiver of sovereign immunity. For example, petitioners may recover only if they have suffered sequelae due to a vaccine injury for more than six months, died as a result of the vaccination, or suffered inpatient hospitalization and surgical intervention as a result of the vaccination. 42 U.S.C. § 300aa-11(c)(1)(D)(i). Petitioners' spouses are not eligible to recover damages for loss of consortium. 42 U.S.C. § 300aa-11(b)(1)(A). Just as Congress imposed these conditions to limit who may sue, Congress placed clear limits on who may sue under the Vaccine Program after receiving a vaccine overseas, and these limits may not be disturbed. Congress, in creating the Vaccine Program, was concerned about the spread of infectious disease from overseas to this country, and thus in order to encourage persons overseas to receive vaccines, allowed people who were likely to return to the United States to file a petition if they had a vaccine reaction. Petitioner was not a federal employee or a member of the Armed Forces. He does not meet the requirements of § 300aa-11(c)(1)(B)(i)(II). Petitioner did not return to the United States within six months of his vaccination. He does not meet the requirements of § 300aa-11(c)(1)(B)(i)(III). For these reasons, petitioner is not a valid petitioner under the Vaccine Act.

## CONCLUSION

Respondent's motion for summary judgment is **GRANTED.** Petitioner's claim is **DISMISSED.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[5]


**IT IS SO ORDERED.**


Dated: <u>April 4, 2014</u>                                                    <u>/s/ Laura D. Millman</u>
                                                                                              Laura D. Millman
                                                                                              Special Master

---

[5] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party, either separately or jointly, filing a notice renouncing the right to seek review.

A032

# United States Court of Appeals
## for the Federal Circuit
*Griffin v. HHS,* 2015-5011

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by LAW OFFICE OF LISA A. ROQUEMORE, Attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **December 17, 2014** counsel for Appellant has authorized me to electronically file the foregoing **Brief for Petitioner-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Lara Englund
U.S. Department of Justice
Civil Division, Torts Branch
1425 New York Avenue, N.W.
Washington, DC 20005
202-307-3013
lara.a.englund@usdoj.gov

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

December 17, 2014                                            /s/ Robyn Cocho
                                                                          Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

     1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

     X       This brief contains <u>13,774</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

             This brief uses a monospaced typeface and contains _____lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

     2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6).

     X       The brief has been prepared in a proportionally spaced typeface using <u>MS Word 2013</u> in a <u>14</u> point <u>Times New Roman</u> font or

             the brief has been paired in a monospaced typeface using _____ _____in a ___characters per inch _____font.

December 17, 2015

                 <u>/s/ Lisa A. Roquemore</u>
                 Lisa A. Roquemore
                 Counsel of Record for the Petitioner- Appellant
                 Law Office of Lisa A. Roquemore
                 192001 Von Karman Ave. Suite 500
                 Irvine, Ca. 92612
                 (949) 622-5572